**FRANCHISED STORES OF NEW YORK, INC. and Thomas Carvel, Plaintiffs-Appellants,**

v.

**Martin WINTER, Defendant-Appellee.**

**No. 293, Docket 31861.**

United States Court of Appeals Second Circuit.

Argued Jan. 26, 1968.

Decided May 1, 1968.

Leonard Toboroff, Yonkers, N. Y.
(Norman S. Isko, Yonkers, N. Y., on the
brief), for plaintiffs-appellants.

Stanford A. Chalson, New York City
(Kenneth S. Goldfarb, William Sostchen

and Goldfarb & Chalson, New York City, on the brief), for defendant-appellee.

Before MEDINA, MOORE and ANDERSON. Circuit Judges.

MEDINA, Circuit Judge.

Appellants Franchised Stores of New York, Inc. and Thomas Carvel appeal from an order of the District Court for the Eastern District of New York which denied their motion for summary judgment and dismissed their complaint for want of federal subject matter jurisdiction in an action brought against Martin Winter for trademark infringement, unfair competition and breach of contract. This appeal presents two distinct questions regarding the interpretation of the Lanham Act, 15 U.S.C. Sections 1051–1127: (1) Can a trademark infringement action be maintained by a trademark owner and his licensee against a sub-licensee while the sub-license agreement is still in effect; and (2) will a trademark infringement action lie where the alleged infringement though occurring in intrastate commerce has a substantial effect on interstate commerce? In the context of the instant case we answer both of the above questions in the affirmative and therefore we reverse.

Thomas Carvel, the owner of the Carvel name and trademarks which are registered with the United States Patent Office, has licensed Franchised Stores of New York, Inc.[1] to use the mark in its business which is the franchising of the use of the Carvel name in connection with the sale of ice cream products at retail stores. Franchised Stores, on April 11, 1955, pursuant to a "Dealer's Franchise Agreement" sub-licensed Martin Winter to operate a Carvel store in East Northport, New York.

We have on a prior occasion dealt with the validity of the entire Carvel operation under the anti-trust laws. Susser v. Carvel Corp., 332 F.2d 505 (2d Cir.), cert. granted 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), writ of cert.

dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). The Federal Trade Commission has also given the matter consideration and filed a comprehensive report. Matter of Carvel Corp., CCH Trade Reg. Rep., Transfer Binder Par. 17,298 (1965). While the findings made by Judge Bartels (see infra) and those of Judge Dooling are expressed in somewhat different phraseology, they are in substance identical. Indeed, there is no real dispute as to the facts which will be outlined below.

The basic document is the Dealer's Franchise Agreement which establishes the contractual relationship between the licensor and approximately 350 dealers operating individual Carvel retail stores in several states on the eastern seaboard. The Carvel operation is an extensive one, involving annual gross sales to the public and sales to the individual stores running into many millions of dollars.

The Preamble of the Dealer's Franchise Agreement provides:

> There has been created a unique system for the production, creation, sale and distribution at retail, of Carvel's Frozen Dairy Products made up in Carvel forms and with toppings and flavorings made in accordance with Carvel Specifications and formula sold in connection therewith. This Frozen Dairy Product is made in accordance with a Carvel formula, consisting of high quality ingredients, and is sold in fine sanitary stores, which are created in accordance with patented designs and specifications. The public has been accustomed to seek Carvel's Frozen Dairy Product at these unique Carvel Stores * * *. The Dealer desires to operate a Carvel Store and Carvel is willing and agrees that the Dealer operate a Carvel Store in accordance with the terms of this agreement.

Other pertinent clauses follow:

> FOURTH: During the term of this agreement, the Dealer agrees to sell at

---

1. The original agreement was signed by "Carvel Stores of New York, Inc." but that entity has since changed its name to Franchised Stores.

the Carvel Store, Carvel's Frozen Dairy Product solely in accordance with the Manual and will sell no other product except as hereinafter expressly otherwise provided. If at any time the Dealer fails to maintain and operate a Carvel Store in accordance with the definition contained in this agreement and in the Manual, then the Dealer's failure to do so shall be deemed to be a breach of a vital term of this agreement and shall entitle Carvel, upon giving written notice to the Dealer, to terminate this agreement.

SIXTH: In order to safeguard the integrity of Carvel's trade-marks, the Dealer agrees that he will purchase from Carvel or from approved sources, designated by Carvel, his entire requirements of Carvel's Frozen Dairy Product mix, toppings, flavorings and other ingredients, cones and any other items sold as a part of the end product that is offered for consumption to the retail purchaser as scheduled in the Standard Operating Procedure Manual at prices indicated therein; * * *.

SEVENTEENTH: * * * The Dealer recognizes that his Carvel Store is one of a large number of stores similarly built and selling to the public similar products, and hence the failure on the part of a single dealer to comply with many of the terms of this agreement could cause irreparable damage to all similar stores. Therefore, in the event of a breach or threatened breach by the Dealer of any of the covenants or provisions of this agreement, Carvel shall have the immediate right to secure an order enjoining any such breach or threatened breach, and, if the agreement has been terminated, the Dealer may be enjoined from any continued operation of the Carvel Store, or any other operation in violation of the agreement.

THIRTIETH: The rights and remedies of Carvel specifically provided for herein shall not be exclusive, but shall be in addition to any other rights and remedies to which Carvel shall be entitled at law or otherwise.

The gravamen of plaintiffs' complaint centers about their allegation that defendant sold certain products to the public in his store which were neither manufactured nor authorized by the Carvel organization. Defendant has admitted using "Liberty" syrup on Carvel products dispensed in "Carvel" marked containers and also selling "Marchiony" ices in unmarked paper squeeze cups, during the years 1964 and 1965.

A complaint was filed in the District Court for the Eastern District of New York in July 1965 and in September of that same year Judge Bartels issued a preliminary injunction enjoining defendant from selling non-Carvel items and products not authorized by the Franchise Agreement. Nevertheless, in July 1967, Judge Dooling denied plaintiffs' motion for summary judgment and dismissed the complaint for lack of federal subject matter jurisdiction because the infringing acts occurred in intrastate commerce and were thus in his opinion not within the coverage of the Lanham Act.

I.

Section 32 of the Lanham Act, 15 U.S. C. Section 1114 provides, in part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

* * * * * *

shall be liable in a civil action by the registrant for the remedies hereinafter provided. * * *

Winter contends that Section 1114 has no application to any of his activities, including the sale of non-Carvel products, because he has never employed a "reproduction, counterfeit or colorable imitation" of plaintiff's trademarks but merely used the "genuine" mark. Furthermore, he maintains that a trademark li-

censor is estopped from proceeding against a licensee under the Lanham Act while the license agreement is still in effect.

We think Winter has misinterpreted the meaning and intent of Section 1114. The Lanham Act has as its object "the protection of trade-marks, securing to the owner the good will of his business and protecting the public against spurious and falsely marked goods." S. Rep. No. 1333, 79th Cong., 2d Sess. 1 (1946), U.S.Code Cong.Serv.1946, p. 1274. The evil sought to be remedied in the trademark infringement action is that of "passing off"—the "sale of another's goods as those of the trade-mark owner by use of the owner's mark." Developments in the Law, Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 818 (1955). It would be totally illogical to provide protection to a trademark owner where someone uses a "colorable imitation" of the mark but to deny protection where the owner's own mark is employed to palm off on the public the merchandise of someone else. A cause of action for trademark infringement exists, assuming the requisite jurisdiction and connection with commerce are established, where an individual uses a trademark (1) without consent; (2) in connection with the sale of goods; (3) where such use is likely to cause confusion or to decieve purchasers as to the source or origin of the goods. Lyon v. Quality Courts United, Inc., 249 F.2d 790, 795 (6th Cir. 1957); Bulova Watch Co. v. Allerton Co., 328 F.2d 20 (7th Cir. 1964). Cf. Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); Coca Cola Co. v. Foods, Inc., 220 F.Supp. 101 (D.C.S.D. 1963); 3 Callmann, Unfair Competition and Trademarks, Section 84.2(c)' (2nd Ed. 1950). Though Winter in the instant case initially had permission to use the "Carvel" mark, that consent did not cover use of the mark on non-Carvel goods. It is obvious that the Carvel trademark was used in connection with the sale of unauthorized goods. "Liberty" syrup formed part of the ingredients used in "sodas and possibly sundaes" which were dispensed in Carvel containers. Similarly, even though the "Marchiony" ices were served in plain squeeze cups, the defendant must be deemed to have used the Carvel mark in connection with their sale since the mark "covers not only Carvel ice cream * * * but also the type of retail outlet at which Carvel ice cream is sold." In the Matter of Carvel Corp., CCH Trade Reg.Rep., Transfer Binder Par. 17,298 at 22.431 (1965). Finally, the sale of the non-Carvel products at defendant's store was likely to produce customer confusion.

Moreover, we reject as unsound the contention that a trademark licensor cannot proceed against the licensee while the license agreement is still in effect. The Lanham Act enables a trademark proprietor to enter into a form of "controlled licensing." Thus Section 5 of the Act, 15 U.S.C. Section 1055 provides:

Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.

A related company, as defined in Section 45, 15 U.S.C. Section 1127, is:

* * * Any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.

Furthermore, the trademark owner's ability to grant licenses is restricted by the fact that failure on his part to control his licensees may result in the cancellation of the mark. Thus, Section 14, 15 U.S.C. Section 1064, provides that a mark may be cancelled if it "has been abandoned" and abandonment is defined in Section 45, 15 U.S.C. Section 1127, as including "any course of conduct of the registrant, including acts of omission as

well as commission, (which cause) the mark to lose its significance as an indicator of origin." Consequently, a trademark owner has "an affirmative duty * * * to take reasonable measures to detect and prevent misleading use of his mark by his licensees or suffer cancellation of his federal registration." Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 366 (2d Cir. 1959). See also Note, Quality Control and the Antitrust Laws in Trademark Licensing, 72 Yale L.J. 117 (1963). It would be anomalous on the one hand to burden the trademark owner with this "affirmative" duty and then on the other hand deny him a federal forum in which to control his licensees. We refuse to pursue this illogical course and hold that, assuming all the requisite elements of infringement are established, a trademark licensor may succeed in a trademark infringement action against one who is still his licensee. See Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 212 F.Supp. 715 (E.D. Pa. 1962). Cf. Smith v. Dental Products Co., 140 F.2d 140 (7th Cir.), cert. denied 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576 (1944).

## II.

Judge Dooling dismissed the complaint because he felt that Section 1114 required that the alleged infringement actually occur in interstate commerce. We disagree.

It is true that prior to the enactment of the Lanham Act a federal remedy for trademark infringement would only lie if the infringing acts occurred in interstate commerce. See Dad's Root Beer Co. v. Doc's Beverages, Inc., 193 F.2d 77 (2d Cir. 1951); United States Printing & Lithograph Co. v. Griggs, Cooper & Co., 279 U.S. 156, 49 S.Ct. 267, 73 L.Ed. 650 (1929); Pure Oil Co. v. Puritan Oil Co., 127 F.2d 6 (2d Cir. 1942). However, by means of the Lanham Act the Congress sought to give trademarks nationally "the greatest protection that can be given them," S.Rep. 1333, 79th Cong., 2d Sess.1946, U.S.Code Cong.Serv.1946, p. 1277, and in order to effectuate that

policy Section 45 of the Act, 15 U.S.C. Section 1127, significantly provides that the "word commerce means all commerce which may lawfully be regulated by Congress." The Supreme Court has liberally construed the "broadened commerce provisions" of the Lanham Act and recognized their "sweeping reach." Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952).

 It has long since been established that the Congress by virtue of its power to "regulate Commerce * * * among the several States" may regulate purely intrastate commerce which exerts a substantial effect on interstate commerce. See, e. g., Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L. Ed.2d 290 (1964). This interpretation has been widely followed in cases under the Lanham Act and federal subject matter jurisdiction has been upheld where an act of infringement though occurring in intrastate commerce has a substantial effect on interstate commerce. See Pure Foods, Inc. v. Minute Maid Corp., 214 F. 2d 792 (5th Cir.), cert. denied 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954); Iowa Farmers Union v. Farmers' Educational and Co-operative Union of America, 247 F.2d 809 (8th Cir. 1957); Lyon v. Quality Courts United, Inc., 249 F.2d 790 (6th Cir. 1957); Drop Dead Co. v. S. C. Johnson & Son, Inc., 326 F.2d 87 (9th Cir. 1963), cert. denied 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964). A substantial effect on interstate commerce is present when the trademark owner's reputation and good will, built up by use of the mark in interstate commerce, are adversely affected by an intrastate infringement. See Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792 (5th Cir.), cert. denied 348 U.S. 888, 75 S.Ct. 208 (1954); Iowa Farmers Union v. Farmers' Educational and Co-operative Union of America, 247 F.2d 809 (8th Cir. 1957); Lyon v. Quality Courts United, Inc., 249 F.2d 790 (6th Cir. 1957). See also Robert, Commentary on the Lanham Act, 15 U.S.C.A., Substit. VII, c. 22, 268–269 (1948); Developments in the Law, Trade-Marks and Unfair Competition, 68

Harv.L.Rev. 814, 882–883 (1955). Nevertheless, Winter maintains that his unauthorized sales of non-Carvel products were *de minimis* and cannot possibly be deemed to have a sufficient effect on interstate commerce. However, the "substantial effect" in this case does not result from the diversion of money from the Carvel licensor resulting from Winter's unauthorized sales. The "substantial effect" test is satisfied because the sale of unauthorized products at individual Carvel stores has a potentially adverse effect on the entire Carvel chain. Thus in Susser v. Carvel Corp., 332 F.2d 505 (2d Cir.), cert. granted 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), writ of cert. dismissed as improvidently granted 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), we recognized the need for quality control in order to protect the public image of the Carvel trademark.

The result we reach here also finds support in our decision in Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959). In that case we held that a trademark owner who had developed his mark by use in interstate commerce could enjoin the use by a defendant of a similar offending mark, even though the defendant was engaged in purely intrastate commerce.[2] If the plaintiff in *Dawn Donut* could maintain a trademark infringement action against a defendant engaged in solely intrastate commerce, Carvel should similarly be able to proceed against Winter. The two cases merely represent different types of infringement and this is not a valid basis for refusing to assert jurisdiction in either instance.

American Auto Association v. Spiegel, 205 F.2d 771 (2d Cir.), cert. denied 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953), relied upon by the District Court below is inapposite. That case merely held that Section 44 of the Lanham Act, 15 U.S.C. Section 1126, did not give the federal courts jurisdiction over all claims for unfair competition brought by those engaged in interstate commerce. See Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 645 (2d Cir.), cert. denied 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

Finally, we note that on remand the District Court pursuant to 28 U.S.C. Section 1338(b) and the doctrine of pendent jurisdiction will be able to consider in addition to plaintiffs' trademark infringement claim, their related causes of action for unfair competition and breach of contract. See Hazel Bishop Inc. v. Perfemme, Inc., 314 F.2d 399, 5 A.L.R. 3d 1031 (2d Cir. 1963).

The order appealed from is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

attempted to use its mark in defendant's market area.

---

2. The case actually only laid down guidelines for future use, as *Dawn Donut Co.*, at the time suit was commenced, had not