**In the Matter of the APPLICATION of SILENUS WINES, INC.**

**Patent Appeal No. 76–647.**

Unites States Court of Customs and Patent Appeals.

June 23, 1977.

Charles Hieken, Hieken & Cohen, Waltham, Mass., attys. of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

BALDWIN, Judge.

This is an appeal from a decision of the Patent and Trademark Office (PTO) Trademark Trial and Appeal Board (board) affirming the refusal of the examiner to register the trademark STEFMON for table wine.[1] Appellant controverts the board's holding that the mark was not used in commerce as required by the Trademark Act of 1946 (Lanham Act).

No dispute exists as to the facts. In the course of its business, appellant orders wine of a specified quality from a French concern (Ed. Kressmann et Cie). The French concern, upon appellant's instructions, applies to the bottles of wine, while still in France, labels supplied by appellant. The labels bear appellant's mark STEFMON together with the words "Shipped by Ed. Kressmann et Cie" and "Imported by Silenus Wines, Inc.," and the labels are the subject of a "Certificate of Label Approval" issued by the Bureau of Alcohol, Tobacco, and Firearms, United States Treasury Department. The French concern then packages the wine and ships it to appellant in the United States. Appellant sells the wine only within Massachusetts.

## OPINION

The issue to be resolved is whether the facts of record establish the "use in commerce" required for registration of STEF-MON by appellant under the Trademark Act of 1946.

Section 1 (15 U.S.C. § 1051 (1976)) of the Trademark Act of 1946 allows registration of trademarks "used in commerce" and requires, inter alia, that an applicant for registration of a trademark make a verified statement "that the mark is in use in commerce." Section 45 (15 U.S.C. § 1127 (1976)) of the act defines "use in commerce," as follows:

For the purposes of this chapter a mark shall be deemed to be used in commerce (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and the goods are sold or transported in commerce and (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith.

That section also defines "commerce" as "all commerce which may lawfully be regulated by Congress."

We note that the "use in commerce" must be accomplished *by the applicant*. This requirement is implied in 15 U.S.C. § 1051 (1976), which specifies that the trademark application must include "the date of applicant's first use of the mark in commerce." We further note that nowhere in the record or briefs has appellant argued that the acts of the French concern in shipping and selling the wine inure to appellant's benefit. Therefore, we will not consider that aspect of the case.[2] Finally, in the act of importing per se, appellant neither "sold" nor "transported" the wine. Thus, such importing per se is not a use in commerce as

1. Serial No. 1,848, filed September 24, 1973.

2. Appellant is barred from claiming the benefits of the "related company" doctrine, 15 U.S.C. § 1055 (1976), because he failed to claim them in his application. 37 CFR 2.38(b) (1976). Whether the "related company" doctrine preempts general agency law concerning when the acts of a party are legally the acts of another, and whether such use by a mere agent can create registration rights, are questions we do not reach.

required by the above-recited definition. The sole issue thus becomes whether appellant's importation and intrastate sale of wine bearing the mark was a "use in commerce."

Appellant argues, inter alia, that we should extend our service mark holding in *In re Gastown, Inc.,* 326 F.2d 780, 51 CCPA 876, 140 USPQ 216 (1964), to cover trademarks used on goods which are imported and sold intrastate. The applicant for a service-mark registration in *Gastown* sold automotive services to interstate travelers from its stations, all of which were within a single state. Some of the stations were located on "federal," interstate highways. This court held that a service mark is used in commerce as required for registration under the Trademark Act when the "services directly affect interstate commerce." [3] We held that services directly affect interstate commerce when the services are sold intrastate to persons moving in interstate commerce, and the services are of the type necessary for the accomplishment of the interstate commerce.

We must first determine whether the reasoning of *Gastown* extends from service marks for services to trademarks on goods. In *Gastown,* the court looked to the statutory definition (quoted above) of the manner in which services must be used in commerce and then held that services are "rendered in commerce" when the rendering directly affects interstate commerce. It logically follows that goods are "sold or transported in commerce" when their sale or transportation directly affects interstate or other commerce which may lawfully be regulated by Congress.

The board determined, by reference to *In re Cook, United, Inc.,* 188 USPQ 284 (TTAB 1975), that *Gastown* must be limited to services because the Trademark Act definition of service use ("rendered in commerce") is patently ambiguous, whereas the goods-use definition is not. It was the curing of this ambiguity, the board said, which caused the *Gastown* result. We disagree. *Gastown's* result depended on the Trademark Act definition of "commerce." This court determined that the definition includes intrastate commerce when such commerce directly affects other commerce which Congress may lawfully regulate. *Gastown's* rationale is not limited to services.

The solicitor distinguishes *Gastown* from the present case, based on the commercial role of the parties, by noting that *Gastown* involved commerce between an applicant and his customer, while this case, the solicitor argues, only involves commerce between a supplier and the applicant. The solicitor is incorrect. In addition to the supplier transaction, this case involves commerce between the applicant and his customer, both of whom, as in *Gastown,* are in the same state when the transaction is consummated. Therefore, even if *Gastown* were limited to its facts, it could not be distinguished from this case based merely on the commercial role of the participants.

 Thus we must consider whether the intrastate sale set out in the facts of this case, namely the intrastate sale of imported wine by the importer, directly affects com-

---

**3.** The narrow and precise issue is simply this: Where an operator of service stations provides automotive service and maintenance for customers who are travelling interstate on federal highways in the course of engaging in interstate commerce, is the operator rendering services "in commerce" within the meaning of Section 45 of the Lanham Act? We believe that this question must be answered in the affirmative. Part of the service rendered by the appellant at its service stations includes delivering gasoline and oth-er automobile products to trucks or other vehicles stalled on highways. Obviously the automobiles and trucks could not travel at all without the gasoline. Such services *directly affect interstate commerce.* Therefore, since appellant's mark is clearly "used * * * in the sale * * * of services and the services are rendered in commerce", the stated ground for refusing to register it must be reversed. [326 F.2d at 782, 51 CCPA at 878–79, 140 USPQ at 217. Emphasis added.]

merce lawfully regulated by Congress.[4] We begin by recognizing that the Constitution expressly gives Congress the power to regulate commerce with foreign nations.[5] We then recognize that, were it not for the intrastate sales anticipated by the appellant-importer, the foreign commerce that occurred in this case would probably not have occurred—unquestionably a direct effect. While appellant's importation is not itself a "use in commerce" by appellant, it is evidence that appellant's sale within Massachusetts was so intimately involved with foreign commerce as to become a "use in commerce" as defined in the Lanham Act.

■ We find further support for our conclusion in the numerous cases in which the Supreme Court has supported Congressional efforts to regulate intrastate transactions which affect interstate or foreign commerce. For example, the Supreme Court has expressly held that intrastate sales of food which had formerly traveled in interstate commerce sufficiently affected that commerce to allow federal regulation of the intrastate sale. *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). While that case involved facts different from the present case,[6] its holding on the broad scope of federal regulatory power appears to be of general application.[7] Thus, we hold that intrastate sale of goods, by the party who caused those goods to move in regulatable commerce, directly affects that commerce and is itself regulatable. Clearly, intrastate sale of imported wines by the importer sufficiently affects commerce with foreign nations to qualify those intrastate sales for the Trademark Act definition of "commerce."

It appears appropriate for this court to state its position on certain legislative history which is said to cast doubt on our view of federal trademark jurisdiction as expressed in *Gastown.*[8] In the Lanham Act, Congress set out what appears to be an unambiguous statement of the scope of federal trademark jurisdiction, namely, "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127 (1976). This language represents an obvious change from the phrasing of the former trademark acts, which phrasing expressly limited trademark jurisdiction to interstate and foreign commerce and commerce with Indians.[9] The

---

4. In the argument of this case, the PTO chose not to reach this issue when appellant raised it in an argument based on *Gastown*. When appellant raised the issue outside of the *Gastown* context in his brief, the solicitor stated only that it was a new issue. Thus, we do not have the benefit of the PTO's view. In the interest of judicial economy, we will consider the issue now.

5. The Constitution of the United States provides in Article I:

Section. 8. The Congress shall have Power * * *;

* * * * * *

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes * * *.

6. In *McClung*, the Supreme Court accepted a Congressional determination that Congress may lawfully regulate the racial segregation policies of a restaurant which sold food that had formerly moved in interstate commerce. This determination was based on a Congressional finding that intrastate sale of interstate food directly affects interstate commerce. 379 U.S. at 303–04, 85 S.Ct. 377.

7. The Court (*McClung*, 379 U.S. at 302, 85 S.Ct. at 383) quoted Chief Justice Marshall with approval:

The activities that are beyond the reach of Congress are "those which are completely within a particular State, and do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." [*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 86, 6 L.Ed. 23 (1824).]

8. For an insightful analysis of this legislative history, see Dunner, *The Effect of the Lanham Act on Intrastate Activities*, 40 J.P.O.S. 379 (1958).

9. Act of Mar. 3, 1881, ch. 138, § 1, 21 Stat. 502, provided that "owners of trade-marks used in commerce with foreign nations, or with the Indian tribes, * * * may obtain registration of such trade-marks * * *."; Act of Feb. 20, 1905, ch. 592, § 1, 33 Stat. 724, provided that "the owner of a trademark used in commerce with foreign nations, or among the several States or with Indian tribes, * * * may obtain registration for such trade-mark * * *."; Act of Mar. 19, 1920, ch. 104, § 1,

change clearly involves a broadening of jurisdiction.[10] In making the change, Congress is presumed to be mindful of the broad scope of Congressional regulatory powers which the Supreme Court has sanctioned, and, in fact, Rep. Lanham and his subcommittee were so mindful.[11] Only a few years before the drafting and passage of the Lanham Act, the Supreme Court stated:

> But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect." [*Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).]

On its face, the Lanham Act provides a clear and unambiguous definition of federal trademark jurisdiction in terms of general Constitutional law as interpreted by the Supreme Court. When a court is faced with unambiguous language in a statute, it is improper to consider extrinsic sources like legislative history to raise ambiguities.[12] However, the Patent and Trademark Office has historically taken the position that statements made at the hearings on the Lanham Act contradict and overshadow this statutory definition of commerce. These statements and the PTO interpretation of them were ably summarized by Mr. P. J. Federico, an Examiner-in-Chief of the PTO, in *Ex parte Standard Oil Co.,* 92 USPQ 259, 259–60 (1952).[13] According to Mr. Federico, Rep. Lanham, the author of the Trademark Act, and Mrs. Leeds

41 Stat. 533, provided that "the Commissioner of Patents shall keep a register of * * * (b) All other marks not registrable under the Act of February 20, 1905, as amended, * * * which have been in bona fide use for not less than one year in interstate or foreign commerce, or commerce with the Indian tribes * * *."

**10.** The Supreme Court, looking at the change as it applied to infringement, expressly recognized "the broadened commerce provisions of the Lanham Act." *Steele v. Bulova Watch Co.,* 344 U.S. 280, 287, 73 S.Ct. 252, 256, 97 L.Ed. 252, 95 USPQ 391, 394 (1952).

**11.** Consider the following colloquy between Rep. Fritz G. Lanham and Harrison F. Lyman of the Boston Patent Law Assoc., *Hearings on H.R. 9041 before the Subcomm. on Trademarks of the House Comm. on Patents,* 75th Cong., 3d Sess. 45 (1938):
> MR. LANHAM. Of course, that is the only way the Congress could have to deal with it, through interstate commerce. However, have not recent decisions restricted somewhat the heretofore accepted meaning of "intrastate commerce"?
> MR. LYMAN. Yes, sir, they have. There is no doubt that they have.
> MR. LANHAM. And if those decisions stand permanently, it might increase the field in which Congress could legislate.
> MR. LYMAN. No doubt those decisions have broadened the field.

**12.** *Helvering v. City Bank Co.,* 296 U.S. 85, 89, 56 S.Ct. 70, 80 L.Ed. 62 (1935).

**13.** As Mr. Federico summarized:
> The hearing before the Senate [sub]committee [*Hearings on H.R. 82 before a Subcomm. of the Senate Comm. on Patents,* 78th Cong., 2d Sess. (1944).] was participated in, as witnesses, by Congressman Lanham himself, government officials from the Department of Justice, the Federal Trade Commission and the Patent Office, and a number of prominent attorneys working in the field of trade marks. Senator Pepper, the chairman of the [sub]committee holding the hearing, was specifically concerned with the question of the applicability of the bill with respect to interstate commerce on the one hand and intrastate commerce on the other. He had the distinct understanding that the bill related solely to interstate commerce for on page 42 he stated, "All this bill has to do with is interstate commerce." Later, apparently considering the language of the bill ambiguous, he endeavored to specifically determine and state the intent (pages 131–133). He first asked for the scope of the then current trade mark law, "to what field do the present laws apply—the present statutes—only to commerce among the States, or do they affect also intrastate commerce which might affect commerce among the States?" He was answered that the statute applied only to interstate commerce. Then the Chairman said, "I should like the record to show a statement by the proponents of this bill as to whether it is intended to affect only commerce among the States or is it intended to affect all the field of commerce which the Congress has the power to control." Congressman Lanham replied with a general

(nee Robert), a renowned supporter of the Act, stated that "commerce" did not cover intrastate transactions regardless of affect on interstate and foreign commerce. In using this legislative history, the PTO implicitly found the statute ambiguous and the history unambiguous.

We reject the PTO position. First, we find the statute clear. Second, we find the recited history ambiguous and inconsistent with prior and subsequent statements of the speakers. For example, it appears that when Rep. Lanham used the term "intrastate commerce," he meant commerce which could not be regulated by Congress and he expressly recognized that the Supreme Court had reduced the scope of commerce which Congress could *not* regulate. See note 11, supra. Thus, when Rep. Lanham used the term "intrastate commerce," he appears to have meant commerce which is *purely* local in nature and effect. Whereas, "interstate and foreign commerce" in-

cludes intrastate commerce which is not purely local in effect because of some direct effect on interstate and foreign commerce. Viewed in this light, Rep. Lanham's remarks are consistent with our position.

Mrs. Leeds, in her "Commentary on The Lanham Trade-Mark Act" and in her book on trademarks, stated that Congress expanded trademark jurisdiction to include intrastate transactions which affect interstate and foreign commerce.[14] While some of the other hearing participants appear to have taken a position contrary to the language of the statute, their opinions as to what the statute should have said will not be used to reverse clear, contrary language in the statute.

Our *Gastown* decision and this opinion are further fortified by the manner in which other federal courts have treated these terms, "use in commerce" and "commerce," when used in the infringement por-

---

statement which was interpreted by the Chairman as meaning that the bill only referred to interstate commerce. Another witness, from the Federal Trade Commission, indicated that the bill was not clear and that the courts would have to determine its scope. Then the Chairman asked a prominent member of the trade mark bar, a member of committees of attorneys which had worked on the bill and an indefatigable worker on its behalf [Mrs. Daphne Leeds (nee Robert)], for a *statement of opinion, "as to whether * * it is the intent of Congress that this bill shall apply to any sort of intrastate commerce?"* The answer was no. The Chairman followed, "It is your understanding that it is the intent of the bill, and if enacted would be the intent of Congress, to apply only to commerce among the States?" And the response was, "That is my understanding—and foreign commerce." The Chairman finally said, after asking the witnesses generally if they agreed, *"I should like the record to show, that, by their silence, those who are here today as* proponents of the bill have agreed to the statement of Mr. Lanham, the author of the bill, and of Miss Robert, who has been regarded as one of the able spokesmen for it, that it is the intention of the bill to apply only to commerce among the States and to foreign commerce." The witness from the Federal Trade Commission added, "And not to local matters that affect or hamper interstate commerce. That is the point I think," to which the Chairman said, "That is correct."

14. In her "Commentary.on The Lanham Trade-Mark Act," 15 U.S.C.A. §§ 81–1113 (1948) at 268, she stated:

> The new Act clarifies and extends the phrase "use in commerce" far beyond the previous laws and the decisions thereunder.
>
> "Commerce" is defined as meaning all commerce which may lawfully be regulated by Congress. This includes commerce between States, between Territories, between States and Territories, within the District of Columbia, within the Territories, between States and the District of Columbia, between Territories and the District of Columbia, and between States, Territories or the District of Columbia and foreign nations. Since there is no limitation, it also appears to extend to any other commerce which burdens, restricts or interferes with the free flow of interstate, territorial or foreign commerce. The Supreme Court has held that an activity which is local in its nature may be regulated by Congress if it exercises substantial economic effect on interstate commerce. It is therefore apparent that purely intrastate uses may come under the provisions of the Act if they have a substantial economic effect on interstate, territorial or foreign commerce.

In her book, D. Robert, *The New Trade-Mark Manual* 11–14 (1947), she reiterated the above construction, but noted the problem of the legislative history. She observed that, since the statutory language was unambiguous, resort should not be made to the legislative history.

**812**

tion of the Lanham Act.[15] Courts have uniformly held, in the infringement context, that "commerce" includes intrastate transactions that affect interstate or foreign commerce.[16] We see no basis for the meaning of commerce in the registration context to be different from the meaning in the infringement context, particularly since the meanings both derive from the *same* definition in 15 U.S.C. § 1127 (1976).

 Since we hold that appellant's importation of wine bearing its trademark from France and intrastate sale of imported wine is a "use in commerce" as defined by the Trademark Act, the refusal of the Patent and Trademark Office to register appellant's mark because it was not used in commerce was error and the decision of the board is *reversed*.

*REVERSED.*

---

**15.** 15 U.S.C. § 1114(1) (1976) provides a civil action for infringement against:

Any person who shall, without the consent of the registrant—
 (a) *use in commerce* any reproduction * * * or
 (b) reproduce * * * a registered mark and apply such reproduction * * * to labels * * * intended to be *used in commerce* * * * . [Emphasis added.]

**16.** *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 488–89, 168 USPQ 609, 614–15 (CA 5 1971); *Franchised Stores, Inc., v. Winter,* 394 F.2d 664, 669, 157 USPQ 466, 469–70 (CA 2 1968); *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 120, 157 USPQ 76, 78 (CA 9), *cert. denied,* 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); *Lyon v. Quality Courts United, Inc.,* 249 F.2d 790, 795, 115 USPQ 300, 303 (CA 6 1957); *Iowa Farmers Union v. Farmers' Educational & Coop. Union,* 247 F.2d 809, 815–16, 114 USPQ 382, 387–88 (CA 8 1957).