# United States Court of Appeals for the Federal Circuit

---

**CHRISTIAN FAITH FELLOWSHIP CHURCH,**
*Appellant*

v.

**ADIDAS AG,**
*Appellee*

---

2016-1296

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92053314.

---

Decided: November 14, 2016

---

RICHARD W. YOUNG, Quarles & Brady, LLP, Chicago, IL, argued for appellant.

JOHN ZACCARIA, Notaro, Michalos & Zaccaria P.C., Orangeburg, NY, argued for appellee. Also represented by BRADLEY S. CORSELLO, ANGELO NOTARO.

---

Before REYNA, HUGHES, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

Christian Faith Fellowship Church appeals a final judgment of the Trademark Trial and Appeal Board that, in response to a petition filed by adidas AG, cancelled its trademarks for failing to use the marks in commerce before registering them. The Board held that the Church's documented sale of two marked hats to an out-of-state resident were *de minimis* and therefore did not constitute use of the marks in commerce under the Lanham Act. Because the Lanham Act defines commerce as all activity regulable by Congress, and because the Church's sale to an out-of-state resident fell within Congress's power to regulate under the Commerce Clause, we reverse the Board's cancellation of the Church's marks on this basis and remand for further proceedings.

BACKGROUND

I.

Christian Faith Fellowship Church is located in Zion, Illinois, within five miles of the Illinois–Wisconsin border. Being located so close to the border, the Church's parishioners include both Illinois and Wisconsin residents. In January 2005, the Church began selling apparel, both caps and shirts, emblazoned with the phrase "ADD A ZERO." The Church sold the "ADD A ZERO"-marked apparel as part of a fundraising campaign to pay off the debt on its church facility and the associated 40-acre tract of land. Illinois-based Icon Industries supplied the Church with the "ADD A ZERO"-marked apparel, which the Church sold in its bookstore.[1]

---

[1] The Church also presented evidence to the Board that it began offering the "ADD A ZERO"-marked apparel for sale on its website in 2010. Like the Board, we do not consider this evidence because it concerns activity after the critical trademark registration date of March 2005. *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381

The Church sought a federal trademark for the "ADD A ZERO" mark at the U.S. Patent and Trademark Office in March 2005. The Church filed two clothing-based trademark applications, one for use of "ADD A ZERO" in standard characters and another for a stylized design of the phrase. The Church's applications relied on actual use of the marks in commerce, not intent to use the marks in commerce. The Office granted the Church's applications and registered the marks as U.S. Registration Nos. 3,173,207 and 3,173,208.

## II.

In 2009, adidas AG ("Adidas") sought a clothing trademark for the phrase "ADIZERO," but the Office refused the application for likelihood of confusion with the Church's "ADD A ZERO" marks. Adidas brought an action before the Trademark Trial and Appeal Board to cancel the Church's marks, arguing several grounds for cancellation: (1) the Church's failure to use the marks in commerce before registration; (2) the marks' failure to function as trademarks; and (3) the Church's abandonment of the marks for nonuse. The Board agreed with Adidas's failure-to-use argument and cancelled the Church's marks, without addressing Adidas's alternate cancellation grounds. The Board considered the Church's proffered evidence—over Adidas's hearsay and authentication objections—of a cancelled check for the sale of two "ADD A ZERO"-marked hats for $38.34 in February 2005, before the Church applied for its marks. The Church had kept the check in its records and cross-referenced it with a sales register it maintained for its bookstore. The check's drawer was Charlotte Howard, who had a Wisconsin home address pre-printed on her check.

---

(Fed. Cir.), *cert. denied*, 136 S. Ct. 88 (2015) ("Use in commerce must be 'as of the application filing date.'" (quoting 37 C.F.R. § 2.34(a)(1)(i))).

The Board disagreed with the Church that the sale to Ms. Howard evidenced the requisite "use in commerce" under the Lanham Act. The Board concluded:

> [T]he sale of two ADD A ZERO caps at a minimal cost within the state of Illinois to Ms. Howard, who resides outside the state, does not affect commerce that Congress can regulate such that the transaction would constitute use in commerce for purposes of registration.
>
> . . . This sale is *de minimis* and, under the circumstances shown here, is insufficient to show use that affects interstate commerce.

*adidas AG v. Christian Faith Fellowship Church*, Cancellation No. 92053314, 2015 WL 5882313, at *7 (T.T.A.B. Sept. 14, 2015) (*Board Op.*) (footnote omitted).

The Church appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

### DISCUSSION

The Lanham Act provides that "[t]he owner of a trademark *used in commerce* may request registration of its trademark." 15 U.S.C. § 1051(a)(1) (emphasis added). Section 1051(a)'s "use in commerce" requirement distinguishes it from § 1051(b), which offers protection for "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce." *Id.* § 1051(b). The Lanham Act explains the "use in commerce" requirement as it relates to goods:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> **(1)** on goods when—

**(A)** it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

**(B)** *the goods are sold* or transported *in commerce* . . . .

*Id.* § 1127 (emphases added). Further, the Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." *Id.* Thus, to register a mark under § 1051(a), one must sell or transport goods bearing the mark such that the sale or transport would be subject to Congress's power under the Commerce Clause, which includes its power to regulate interstate commerce. *Larry Harmon Pictures Corp. v. Williams Rest. Corp.*, 929 F.2d 662, 664 (Fed. Cir. 1991) (citing U.S. Const., art. I, § 8); *see also In re Silenus Wines, Inc.*, 557 F.2d 806, 808–12 (CCPA 1977).

The dispute between the parties in this case is limited to whether the Church, which filed its applications under § 1051(a)'s "use in commerce" subsection, made a sale of marked goods in commerce regulable by Congress before applying for its marks.

## I.

As a threshold matter, we address whether the Board erred in admitting Ms. Howard's check into evidence and in finding that Ms. Howard resided in Wisconsin. Adidas argues that the Board should not have admitted the check because Ms. Howard's pre-printed address on the check constitutes inadmissible hearsay and because the check was not authenticated. We review the Board's admission of the check for abuse of discretion. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1363 (Fed. Cir.

2012) (citing *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1390 (Fed. Cir. 2010)). "We will reverse only if the Board's evidentiary ruling was: (1) 'clearly unreasonable, arbitrary, or fanciful'; (2) 'based on an erroneous conclusion[] of law'; (3) premised on 'clearly erroneous findings of fact'; or (4) the record 'contains no evidence on which the Board could rationally base its decision.'" *Id.* (quoting *Crash Dummy Movie*, 601 F.3d at 1390–91).

No party disputes that Ms. Howard's pre-printed address on the check is a hearsay statement, which is typically not admissible into evidence. The Federal Rules of Evidence provide, however, an exception to the bar on hearsay evidence for business records of regularly conducted conduct kept in the ordinary course. Fed. R. Evid. 803(6). The Board relied on this exception in admitting Ms. Howard's check. A Church pastor, whose duties included Church recordkeeping, testified that the check was maintained in the Church's records in the normal course of Church bookstore sales, along with the corroborating entry in the bookstore ledger of sales. Adidas argues that the pre-printed address on the check had nothing to do with Church business, and therefore, the check should not have been admissible under the business records exception. We disagree.

The business records exception "does not require that the document actually be prepared by the business entity proffering the document." *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1343 (Fed. Cir. 1999). When a business relies on a document it has not itself prepared, two factors bear on the admissibility of the evidence as a business record: "[1] that the incorporating business rely upon the accuracy of the document incorporated[;] and [2] that there are other circumstances indicating the trustworthiness of the document." *Id.* We hold that the Board did not abuse its discretion in determining that the Church relied on the check, a bank-issued nego-

tiable instrument, as accurate and trustworthy. We also hold that the check is self-authenticating as commercial paper under Federal Rule of Evidence 902(9). *See United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) ("[A] check is a species of commercial paper, and therefore self-authenticating" (citing Fed. R. Evid. 902(9))).

Based on the admitted check and a Church pastor's testimony that many Church parishioners reside in Wisconsin, the Board found that Ms. Howard resided in Wisconsin. Adidas argues this factual conclusion was unsupported. We review the Board's factual determinations under a substantial evidence standard. *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1350 (Fed. Cir. 2010) (citing *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003); 5 U.S.C. § 706(2)(E)). We conclude that the admitted check and the Church pastor's testimony constitute substantial evidence to support the Board's determination regarding Ms. Howard's residence.

## II.

Having resolved that the Board properly admitted the Church's evidence of an intrastate sale to an out-of-state resident, we now consider whether such a sale is regulable by Congress, satisfying the Lanham Act § 1051(a) "use in commerce" requirement. We review de novo the Board's legal conclusions, including "its interpretations of the Lanham Act and the legal tests it applies in measuring registrability." *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012) (quoting *In re Save Venice N.Y., Inc.*, 259 F.3d 1346, 1351–52 (Fed. Cir. 2001)); *cf. Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016) (holding the meaning of "commerce" element in a different federal statute, the Hobbs Act, to be a question of law).

## A.

Congress's power under the Commerce Clause is broad. *Larry Harmon*, 929 F.2d at 664 (citing *Silenus*

*Wines*, 557 F.2d at 809–10). The Supreme Court's contemporary Commerce Clause decisions illustrate Congress's legislative abilities under this enumerated power. Beginning in the modern era with *Wickard v. Filburn*, the Supreme Court has interpreted the Commerce Clause as vesting in Congress the power to regulate activities that have a substantial effect on interstate commerce, explaining:

> [E]ven if . . . activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."

317 U.S. 111, 125 (1942). In *Wickard*, a farmer grew wheat for commercial sale, but also for personal and farm use. *Id.* at 114. Congress passed a statute imposing quotas on the amount of wheat that farmers could harvest, with penalties assessed for harvesting wheat in excess of the quota level, even if the wheat was for personal use and not for sale. *Id.* at 114–15, 119. The farmer challenged the statute's application to him as exceeding Congress's Commerce Clause powers, claiming his wheat harvesting was local in nature and had, at most, only an indirect effect on interstate commerce. *Id.* at 119. The Court disagreed with the farmer's arguments, holding that the activity must be viewed not in isolation, but in the aggregate: "That [the farmer's] own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28.

The Supreme Court reaffirmed *Wickard*'s "substantial effects" doctrine in *Gonzales v. Raich*, in which one of the

parties grew marijuana on her property for personal, medicinal use and did not sell or transport the drug. 545 U.S. 1, 6–8 (2005). She argued that her local and *de minimis* cultivation and possession of marijuana should not be subject to federal drug laws passed under the Commerce Clause. *Id.* at 15. The Supreme Court framed her argument as a request to "excise individual applications of a concededly valid statutory scheme." *Id.* at 23. But the Supreme Court held the statute's application to individuals was a valid exercise of Congress's powers under the Commerce Clause, indicating that its "case law firmly establishes Congress's power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17 (citing *Perez v. United States*, 402 U.S. 146, 151 (1971); *Wickard,* 317 U.S. at 128–29). The Court did not believe that the case turned on the intrastate nature of the marijuana cultivation and possession at issue, explaining "[t]hat the regulation ensnares some purely intrastate activity is of no moment." *Id.* at 22. The Court "refuse[d] to excise individual components of th[e] larger scheme," *id.*, because, "where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class," *id.* at 23 (quoting *Perez,* 402 U.S. at 154 (alteration omitted)). Thus, the Court held that when "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence" and Congress has the power to regulate it under the Commerce Clause. *Id.* at 17 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)).

The Supreme Court most recently addressed the Commerce Clause's "substantial effects" doctrine in *Taylor*, which involved a man federally convicted of robbery under a provision of the Hobbs Act for his participation in two home invasions involving marijuana deal-

ers. 136 S. Ct. at 2077–78 (citing 18 U.S.C. § 1951(a)). The Hobbs Act criminalizes robberies and attempted robberies that affect any commerce "over which the United States has jurisdiction." *Id.* at 2077 (quoting 18 U.S.C. § 1951(b)(3)). Citing *Raich*, the Court held that Congress legislated within its Commerce Clause powers when enacting the provision at issue. *Id.* at 2077–78, 2080. As applied, the Court reiterated that, under the aggregation approach to the substantial effects test, "proof that the defendant's conduct in and of itself affected or threatened commerce is not needed." *Id.* at 2081. Rather, the Court instructed that "[a]ll that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect" on commerce. *Id.* The Court emphasized that, in the case before it, "the Government need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines. . . . And it makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal." *Id.* (citing *Perez*, 402 U.S. at 154).

## B.

Our past Lanham Act "use in commerce" cases equally reflect the broad scope of Congress's Commerce Clause powers. For example, in *Larry Harmon*, the appellant argued that the Lanham Act's "use in commerce" requirement could not "be satisfied by a single-location restaurant . . . that serves only a minimal number of interstate travelers." 929 F.2d at 663. The appellant did not dispute "that there ha[d] been some use in commerce of [registrant]'s mark," and indeed, the record established that the "mark ha[d] been used in connection with services rendered to customers traveling across state boundaries." *Id.* at 666. Yet, the appellant petitioned this court to adopt a standard relating to the percentage of services furnished to interstate travelers to determine whether a mark had been used in commerce under the Lanham Act.

*Id.* We refused to do so. Recognizing that "[t]he Lanham Act by its terms extends to all commerce which Congress may regulate," *id.*, and that "Congress has broad powers under the commerce clause," *id.* at 664, we "reject[ed] [appellant]'s argument that a certain increased threshold level of interstate activity is required before registration of the mark used by a single-location restaurant may be granted," *id.* at 666. Likewise, our predecessor court explained in *Silenus Wines* that because Congress passed the Lanham Act in the wake of *Wickard* and because the Act expansively defines commerce as "all commerce which may lawfully be regulated by Congress," it "clearly involves a broadening of jurisdiction" from earlier federal trademark statutes. 557 F.2d at 809–10. The court held that, under this broad jurisdiction, the intrastate sale of imported French wine constitutes "use in commerce" under the Act. *Id.* at 809.

## C.

Moving to the facts of this case, it is clear in light of the foregoing precedent that the Church's sale of two "ADD A ZERO"-marked hats to an out-of-state resident is regulable by Congress under the Commerce Clause and, therefore, constitutes "use in commerce" under the Lanham Act. We reach this conclusion without defining the outer contours of Congress's Commerce Clause powers because the transaction at issue falls comfortably within the bounds of those powers already sketched for us by the Supreme Court. The Lanham Act is a comprehensive scheme for regulating economic activity—namely the marking of commercial goods—and the "use in commerce" pre-registration requirement is an "essential part" of the Act. *Lopez*, 514 U.S. at 561. Further, it cannot be doubted that the transaction at issue—the private sale of goods, particularly apparel, to an out-of-state resident—is "quintessentially economic." *Raich*, 545 U.S. at 25; *see United States v. Morrison*, 529 U.S. 598, 611 (2000) ("[I]n those cases where we have sustained federal regulation of

intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."). This transaction, taken in the aggregate, would cause a substantial effect on interstate commerce and thus it falls under Congress's Commerce Clause powers. *Taylor*, 136 S. Ct. at 2080–81; *Raich*, 545 U.S. at 17; *Wickard*, 317 U.S. at 125. The Church did not need to present evidence of an actual and specific effect that its sale of hats to an out-of-state resident had on interstate commerce. Nor did it need to make a particularized showing that the hats themselves were destined to travel out of state. *See Taylor*, 136 S. Ct. at 2081.

The Board's rationale that the sale to Ms. Howard was "*de minimis*" and thus "insufficient to show use that affects interstate commerce" is squarely at odds with the *Wickard* progeny of Commerce Clause cases. *Board Op.* at *7. In particular, the Board's reasoning contravenes *Raich*, which expressed that "the *de minimis* character of individual instances" arising under a valid statute enacted under the Commerce Clause "is of no consequence." 545 U.S. at 17. "[I]t makes no difference under our cases that any actual or threatened effect on commerce in a particular case is minimal." *Taylor*, 136 S. Ct. at 2081 (citing *Perez*, 402 U.S. at 154); *see also Larry Harmon*, 929 F.2d at 666. Adidas's argument that the Church must present actual proof that its sale to Ms. Howard directly affected commerce also contradicts precedent. "[P]roof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." *Taylor*, 136 S. Ct. at 2081.

Adidas would like us to cabin *Raich* and *Taylor* to their particular facts, namely to cases involving the market for illegal drugs. But the Supreme Court's elucidation of the Constitutional reach of the Commerce

Clause in those cases applies to more than just federal drug regulation. *Raich* and *Taylor* apply, and indeed rest on, principles derived from *Wickard*, which involved the national market for wheat, not illegal drugs. And *Taylor* is particularly applicable because, similar to the present case, it involves the construction of a statutory provision that defines "commerce" as including "all . . . commerce over which the United States has jurisdiction," 18 U.S.C. § 1951(b)(3). Moreover, there is nothing in these cases themselves to limit the Constitutional precepts and legal tests discussed therein to their facts. The Supreme Court has advised that, as a court of appeals, we must not "confus[e] the factual contours of [a Supreme Court decision] for its unmistakable holding" in an effort to reach a "novel interpretation" of that decision. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534–35 (1983) (per curiam); *see also Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312 (1994) ("[O]nce the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law."); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (en banc) ("As a subordinate federal court, we may not so easily dismiss [the Supreme Court's] statements as dicta but are bound to follow them."). We find that the principles discussed in *Raich* and *Taylor* apply here regardless of the factual differences at play.

## D.

Finally, we note that the Board erred by not properly applying our holdings in *Larry Harmon* and *Silenus Wines*, which bear on the Lanham Act's "use in commerce" requirement specifically rather than on the Commerce Clause in the abstract. Had it done so, it would not have concluded that a sale it characterized as *de minimis* was therefore insufficient to satisfy the "use in commerce" requirement.

In *Larry Harmon*, we refused to adopt a *de minimis* test for the "use in commerce" requirement. 929 F.2d at 666. We further held that the Lanham Act by its terms extends to all commerce which Congress may regulate. *Id.* Although *Larry Harmon* involved a service mark and the marks here are for goods, the "in commerce" requirement is the same regardless of the type of mark and thus *Larry Harmon* applies to this case. True enough, § 1127 provides distinct tests for the type of *use* that must occur for goods versus services to satisfy the "use in commerce" requirement. For example, the statute requires that marked goods be "sold or transported" in commerce, while service marks must be "used or displayed in the sale or advertising of services and the services [must be] rendered" in commerce. But this distinction goes to the meaning of "use" in the "use in commerce" requirement, not to whether a use is "in commerce," which we analyze under the same rubric regardless of the delineation between goods and services.

Our predecessor court made this very point in *Silenus Wines*, 557 F.2d 806. In that case, the court rejected the argument that an earlier decision, *In re Gastown, Inc.*, 326 F.2d 780 (CCPA 1964), was limited to service marks. *Silenus Wines*, 557 F.2d at 808. *Gastown* held that an applicant's operation of marked auto service stations on an interstate highway satisfied the "use in commerce" requirement. *Gastown*, 326 F.2d at 784. *Silenus Wines* explained that "*Gastown*'s rationale is not limited to services" because its "result depended on the Trademark Act definition of 'commerce'" rather than on the Act's prescribed uses for service marks. *Silenus Wines*, 557 F.2d at 808.

The Board also erred to the extent it relied on *In re Cook, United, Inc.*, 188 U.S.P.Q. 284 (T.T.A.B. 1975), and *In re The Bagel Factory, Inc.*, 183 U.S.P.Q. 553 (T.T.A.B. 1974), for the proposition that an intrastate sale of goods can never be a sale "in commerce" without the trademark

applicant doing something more, such as knowingly directing the movement of goods across state lines. *Cook*, 188 U.S.P.Q. at 287–88; *Bagel Factory*, 183 U.S.P.Q. at 554–55. These Board cases have been the source of confusion in our "use in commerce" doctrine. Doubt has been cast on the vitality of the *Bagel Factory* holding, with commentators noting that "under the modern interpretations of the Commerce Clause . . . it would appear that a sale or delivery does not have to cross a state line in order to affect 'commerce.'" 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:123 (4th ed.) (footnote omitted). Others have similarly explained that, in *Cook*, "the PTO was operating under a different standard" than the one provided in the Supreme Court's Commerce Clause precedent and have concluded that, especially after *Larry Harmon*, "not only is the PTO's perspective [as stated in *Cook*] no longer appropriate nor correct, it is no longer the law." Peter C. Christensen & Teresa C. Tucker, *The "Use in Commerce" Requirement for Trademark Registration After* Larry Harmon Pictures, 32 IDEA 327, 332, 341 (1992).

To the extent *Cook* and *Bagel Factory* assert that the Lanham Act requires commercial activity, whether for goods or services, beyond that which is sufficient for Congress to regulate commercial activity under the Commerce Clause, they are incorrect. It is beyond dispute that "the definition of commerce in the Lanham Act means exactly what the statute says, i.e. 'all commerce which may lawfully be regulated by Congress.'" *Larry Harmon*, 929 F.2d at 666 (quoting 15 U.S.C. § 1127); *see also Gastown*, 326 F.2d at 784 (quoting *Bulova Watch Co. v. Steele*, 194 F.2d 567, 571 (5th Cir.), *aff'd*, 344 U.S. 280 (1952)); *cf. Taylor*, 136 S. Ct. at 2079 (construing provision of Hobbs Act—which defines "commerce" as including "all . . . commerce over which the United States has jurisdiction," 18 U.S.C. § 1951(b)(3)—as extending to full reach of Congress's Commerce Clause powers). Because

one need not direct goods across state lines for Congress to regulate the activity under the Commerce Clause, there is likewise no such per se condition for satisfying the Lanham Act's "use in commerce" requirement. *See Raich*, 545 U.S. at 22 ("That the regulation [passed under the Commerce Clause] ensnares some purely intrastate activity is of no moment."); *Wickard*, 317 U.S. at 125 ("[E]ven if . . . activity be local . . . it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ."). In so holding, we comport with our own precedent, which disavows the bright line approach taken in *Cook* and *Bagel Factory*. *See Larry Harmon*, 929 F.2d at 666 ("It is not required that such services be rendered in more than one state to satisfy the use in commerce requirement." (citing *Gastown*, 326 F.2d at 782–84)); *Silenus Wines*, 557 F.2d at 810–811 ("[The PTO] stated that 'commerce' did not cover intrastate transactions regardless of affect on interstate and foreign commerce. . . . We reject the PTO position.").

## CONCLUSION

For the foregoing reasons, we reverse the Board's cancellation of the Church's "ADD A ZERO" marks for not using them in commerce before federally registering them and remand for the Board to address Adidas's other cancellation grounds.

## **REVERSED AND REMANDED**

### COSTS

Costs to Appellant.