This Opinion is a
Precedent of the TTAB

Mailed: December 7, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*Tao Licensing, LLC*
*v.*
*Bender Consulting Ltd. d/b/a Asian Pacific Beverages*

____

Cancellation No. 92057132

____

Howard J. Shire and Jeremy S. Boczko of Andrews Kurth Kenyon LLP
for Tao Licensing, LLC

Evan A. Raynes of Symbus Law Group, LLC
for Bender Consulting Ltd. d/b/a Asian Pacific Beverages

____

Before Adlin, Heasley, and Lynch
Administrative Trademark Judges.

Opinion by Lynch, Administrative Trademark Judge:

Tao Licensing, LLC ("Petitioner") petitions to cancel Registration No. 4169245 for

the mark TAO VODKA[1] for "Alcoholic beverages except beers" in International Class

---

[1] Issued on the Principal Register on July 3, 2012, from an application filed July 11, 2011, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1071(b), with a subsequent statement

33 on the grounds of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1152(d), likelihood of dilution under Sections 14 and 43(c) of the Trademark Act, 15 U.S.C. §§ 1064 and 1125(c), lack of a bona fide intent to use the mark under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), and nonuse as of the statement of use under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a).[2] Petitioner alleges that Bender Consulting Ltd. d/b/a Asian Pacific Beverages ("Respondent") pursued its registration of TAO VODKA only after Respondent's owner failed in his attempt to sell Kai Vodka to Petitioner for use in Petitioner's TAO restaurants and nightclubs.[3]

Petitioner pleads ownership of Registration Nos. 2472393[4] and 3770321[5] both for the mark TAO in standard characters for, respectively, "Restaurant services" and "Night clubs, special events and party planning; and coordinating and providing facilities for entertainment events in the nature of parties and special events featuring music, singing, dancing, lectures, and celebrity or professional

---

of use asserting first use and first use in commerce at least as early as April 9, 2012. The mark is in standard characters, and "VODKA" has been disclaimed.

[2] 22 TTABVUE (Amended Complaint).

[3] 90 TTABVUE 8 (Petitioner's Brief).

[4] Issued July 24, 2001, from an application filed January 3, 2000, asserting first use and use in commerce at least as early as October 26, 2000; renewed.

[5] Issued April 6, 2010, from an application filed May 26, 2009, asserting first use and first use in commerce at least as early as October 26, 2000; Section 8 affidavit accepted. The registration includes a statement that "[t]he English translation of 'TAO' in the mark is the way."

entertainment." Petitioner also alleges prior common law rights in TAO "in connection with the sale of alcoholic beverages, including vodka."[6]

In its answer, Respondent denies the salient allegations of the amended petition and asserts the affirmative defense of acquiescence. However, Respondent did not submit any evidence regarding the defense, nor did it argue acquiescence in its brief. The defense is therefore waived. *See Harry Winston, Inc. v. Bruce Winston Gem Corp.,* 111 USPQ2d 1419, 1422-23 n.7 (TTAB 2014).

## I.    Evidentiary Record

Respondent submitted the declaration testimony of Marcus Bender, its sole owner, which includes numerous exhibits. The parties agreed to permit witnesses to testify by affidavit or declaration, provided that the adverse party had the opportunity to cross-examine.[7] Petitioner objects to Mr. Bender's testimony on a variety of grounds, including hearsay, lack of personal knowledge, irrelevance, and that it constitutes opinion testimony from a non-expert. Petitioner also seeks to exclude exhibits to the declaration that, according to Petitioner, constitute hearsay or lack proper foundation. Respondent did not address the objections in detail, except to defend against allegations that the declaration should be excluded because it was prepared by Respondent's attorney, rather than by Mr. Bender.[8]

---

[6] 22 TTABVUE 5 (Amended Complaint).

[7] 39 TTABVUE 3. This stipulation occurred prior to the revision of Trademark Rule 2.123(a), 37 CFR § 2.123(a), which now allows for affidavit and declaration testimony, subject to certain requirements, without the need for a stipulation.

[8] 93 TTABVUE 10 n.1 (Respondent's Brief).

As to the testimony itself, "the Board generally does not strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, the Board considers such objections when evaluating the probative value of the testimony at final hearing." *Bd. of Regents v. S. Ill. Miners, LLC*, 110 USPQ2d 1182, 1194 n.19 (TTAB 2014) (citations omitted). We therefore overrule the objection but will weigh the relevance and strength or weakness of the objected-to testimony, including any inherent limitations therein. For example, we have disregarded any opinion testimony regarding the conclusions of law in this case. *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1755 (TTAB 2013), *aff'd mem.*, 565 Fed. Appx. 900 (Fed. Cir. 2014).

Turning to the objected-to exhibits, "[a]s a general matter, we do not treat testimony as to third-party out-of-court statements as proof of the truth of the matter asserted. The same is true for published articles [and internet website printouts]. However, such materials are frequently competent to show, on their face, matters relevant to trademark claims (such as public perception), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face." *Harry Winston,* 111 USPQ2d at 1427-28. The objections to copies of third-party registrations attached as exhibits are overruled. *Trademark Trial and Appeal Board Manual of Procedure* ("TBMP") § 704.03(b)(1)(B) (June 2017). In short, as indicated, "the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such

testimony and evidence. Thus, we have considered the evidence, keeping in mind the objections, and have accorded whatever probative value the testimony and evidence merits." *United States Playing Card Co. v. Harbro, LLC*, 81 USPQ2d 1537, 1540 (TTAB 2006).

Turning to Petitioner's proposed expert testimony of James William Bonbrest, its Chief Operating Officer, Respondent notes that it "does not object to the Board's consideration of Mr. Bonbrest's declaration," but alleges that "he is certainly not an expert witness, and as he works for [Petitioner], he is clearly biased."[9] We need not treat Mr. Bonbrest as an expert, but credit his testimony as a fact witness with experience in the restaurant and nightclub industry, including interactions with spirits manufacturers and distributors.[10] However, "[w]e have also weighed the probative value of [the] testimony against any potential bias," *Alcatraz Media*, 107 USPQ2d at 1755, including taking account of Mr. Bonbrest's potential bias based on his employment with Petitioner. To the extent Mr. Bonbrest's testimony may be entitled to less weight because of his bias, Mr. Bender's also would be, because he too is affiliated with a party.

The record[11] consists of:

---

[9] 93 TTABVUE 30 n.41 (Respondent's Brief).

[10] 47 TTABVUE 3-4 (Bonbrest Declaration).

[11] Petitioner generally cited to evidence by document title and paragraph number, transcript page number, or Bates number, and therefore is directed to the guidance in *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014):

> Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which

- The pleadings;

- The file of Registration No. 4169245;

- Excerpts of the file histories of Petitioner's pleaded registrations, Petitioner's Second Notice of Reliance, 41 TTABVUE 4-46;

- Status-and-title copies of Petitioner's pleaded registrations, Registration Nos. 2472393 and 3770321, Petitioner's First Notice of Reliance, 40 TTABVUE 5-22;

- Excerpts of the file history of Respondent's Application Serial No. 86518176 for the mark TAO OF VODKA, Petitioner's Seventh Notice of Reliance, 70 TTABVUE 4-11;

- Excerpts of Respondent's interrogatory answers and responses to document requests, Petitioner's Eighth Notice of Reliance, 86 TTABVUE 6-63;

- Excerpts of Respondent's responses to requests for admission and interrogatory answers, Petitioner's Sixth Notice of Reliance, 46 TTABVUE 2-20;

- Excerpts of Petitioner's Interrogatory Answers, Respondent's Notice of Reliance, 58 TTABVUE 5-20;

- The amended testimony declaration of Mr. Bender, 80 TTABVUE 5-56, and exhibits thereto, 81 TTABVUE 3-254, 82 TTABVUE 2-323, 83 TTABVUE (confidential version);

- Mr. Bender's testimony on cross-examination and exhibits thereto, 72 TTABVUE 2-245, 73 TTABVUE (confidential version);

- Excerpts from Petitioner's discovery deposition of Mr. Bender and exhibits thereto, Petitioner's Fifth Notice of Reliance, 44 TTABVUE 11-47, 45 TTABVUE (confidential version);

- Mr. Bonbrest's testimony declaration and exhibits thereto, 47 TTABVUE 3-117; 48 TTABVUE (confidential version);

- Mr. Bonbrest's rebuttal testimony declaration and exhibits thereto, 69 TTABVUE 2-20;

does not appear on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation.

- *6* -

- The testimony declaration of Richard Wolf, a Managing Member of Petitioner, and exhibits thereto, 49 TTABVUE 3-157, 51 TTABVUE (confidential version);

- Mr. Wolf's rebuttal testimony declaration and exhibit thereto, 67 TTABVUE 2-6, 68 TTABVUE (confidential version);

- Excerpts of various printed publications, Petitioner's Fourth Notice of Reliance, 43 TTABVUE 6-65.

## II.  Standing and Priority

"A petitioner is authorized by statute to seek cancellation of a mark where it has 'both a "real interest" in the proceedings as well as a "reasonable" basis for its belief of damage.'" *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (quoting *ShutEmDown Sports, Inc. v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012) and citing *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999)). Petitioner's prior registrations for a mark similar to Respondent's mark, used with restaurant and nightclub services that prominently feature goods such as Respondent's, establish Petitioner's real interest and standing. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (petitioner's prior registrations establish "direct commercial interest and its standing to petition for cancellation"); *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

Although both Petitioner and Respondent own registrations, it is undisputed that Petitioner has priority. The January 3, 2000 and May 26, 2009 filing dates of the applications that matured into Petitioner's pleaded registrations precede the July 11, 2011 filing date of the application that matured into Respondent's challenged

registration. *See Brewski Beer Co. v. Brewski Bros. Inc.*, 47 USPQ2d 1281, 1284 (TTAB 1998) (A petitioner who owns a registration may rely on it to establish constructive first use as of the application filing date). Respondent has neither alleged nor proven an earlier priority date.

## III. Background

Petitioner owns and operates several restaurants and nightclubs named TAO in cities including New York and Las Vegas (hereinafter, "TAO venues").[12] The TAO venues attract millions of customers annually.[13] Lists of the top-grossing restaurants and nightclubs in the United States routinely feature the TAO venues,[14] which also have been named "Best Mega Nightclub" on *Las Vegas Weekly*'s "Vegas' Best 2009" list,[15] "Nightclub of the Year" on the 2010 Nightclub and Bar Awards list,[16] and one of the "10 Most Instagrammed Restaurants in America."[17] A 2007 *New York Times* article on TAO in Las Vegas reported it as "the highest grossing independent restaurant in the United States," and noted that "[e]ven judged against other huge-

---

[12] 49 TTABVUE 3-4 (Wolf Declaration).

[13] *Id.* at 6.

[14] *Id.* at 107 (R&I Restaurants & Institutions 2008 list), 105 (R&I Restaurants & Institutions 2009 list), 108 (R&I Restaurants & Institutions 2010 list), 110 (Huffington Post report on Restaurants & Institutions' list of Top 100 Independent Restaurants of 2010), 112-17 (www.restaurantbusinessonline.com), 146 (www.8newsnow.com).

[15] *Id.* at 69.

[16] *Id.* at 65.

[17] *Id.* at 122-125 (www.foodandwine.com).

volume restaurants, where revenues in the tens of millions are not unusual, Tao is setting a new standard."[18]

While Petitioner's registrations are in standard characters, extending to any font style, *see In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 (Fed. Cir. 2012) and Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a), Petitioner also has established prior use of the mark in the following style: .[19]

Turning to Respondent, Mr. Bender formed the company in 1990 and is its sole owner.[20] He formed a related entity, Kai Vodka LLC ("Kai"), in 2006 whose "main product" is named Kai Vodka.[21] Respondent is Kai's managing member and a part owner.[22] According to Mr. Bender, "Kai and [Respondent] are separate entities, but the companies frequently cooperate on various projects in order to reduce costs."[23] In 2010, Mr. Bender visited one of the TAO venues in an unsuccessful attempt to sell it Kai Vodka.[24] Thereafter, on July 11, 2011, Respondent filed the intent-to-use application for TAO VODKA that matured into the registration at issue.

---

[18] 49 TTABVUE 104.

[19] *E.g.*, 49 TTABVUE 34 and 80-96, 44 TTABVUE 24-37, 47 TTABVUE 35-48.

[20] 80 TTABVUE 6 (Amended Bender Declaration).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] 45 TTABVUE 26 (Confidential Bender Discovery Deposition).

Mr. Bender acknowledged that TAO VODKA "is the same product" as Kai Vodka – manufactured in the same way with the same formula and ingredients.[25] As Mr. Bender described it, the only difference between the products is "the name, the positioning, and the target audience."[26]

Mr. Bender testified that Respondent and Kai both "were involved in securing the formula and label approvals required for the sale of TAO VODKA in the United States," and that "Kai also imported TAO VODKA into the United States on [Respondent's] behalf."[27] Kai registered the trade name "Tao Vodka Imports" in Hawaii in 2011, and according to Mr. Bender, "sometimes used this trade name when assisting [Respondent] with various tasks relating to TAO VODKA."[28] Mr. Bender's amended declaration testimony in this regard conflicts with the original statement in his discovery deposition that Tao Vodka Imports was a d/b/a of Respondent, which statement Mr. Bender subsequently changed on the errata sheet for the deposition transcript.[29] An employee of Kai submitted the application for vodka formula approval to the Alcohol and Tobacco Tax and Trade Bureau in Kai's name.[30] Although the formula approval application lists the product name as Kai Vodka, Mr. Bender

---

[25] *Id.* at 35; *see also* 80 TTABVUE 8 (Amended Bender Declaration).

[26] 45 TTABVUE 35 (Confidential Bender Discovery Deposition). *See* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party.").

[27] 80 TTABVUE 12 (Amended Bender Declaration).

[28] *Id.* at 6-7.

[29] *Id.;* 81 TTABVUE 22-23 (errata sheet); 45 TTABVUE 48 (Confidential Bender Discovery Deposition); *see also* 72 TTABVUE 28 (Bender Cross Examination Testimony).

[30] 72 TTABVUE at 24-25.

alleges that it "encompassed TAO VODKA" because it used the same formula.[31] The TAO VODKA label itself included the email address info@kaivodka.com and the website http://www.kaivodka.com.[32] Mr. Bender acknowledged that vodka "is typically imported by the trademark owner, but in this case, it was imported by another entity – Kai."[33] Mr. Bender testified that he discussed the formula for and manufacturing of TAO VODKA with the Vietnamese distillery and consultant that later manufactured it "sometime during the first quarter of 2011."[34]

Respondent filed a statement of use ("SOU") on April 24, 2012, in advance of the September 20, 2012 SOU deadline, alleging use of the mark in commerce as of April 9, 2012. Respondent's specimen of use showed its mark on a bottle in the following

---

[31] 80 TTABVUE 8 (Amended Bender Declaration); *see also* 72 TTABVUE 25 (Bender Cross Examination Testimony, stating, "This is the formula that we used for Tao Vodka and is the same formula as it is for Kai Vodka.").

[32] 72 TTABVUE 29 (Bender Cross Examination Testimony).

[33] *Id.* at 32.

[34] 80 TTABVUE 7 (Amended Bender Declaration).

font: .[35] However, no sales under the TAO VODKA mark occurred until more than 2½ years later, in December 2014, a fact we discuss in more detail *infra*.[36]

To establish use of the mark in commerce for purposes of the SOU, Respondent focuses on one case of sample bottles of TAO VODKA. In mid-April 2012, the Vietnamese distillery shipped one case of vodka samples bearing the TAO VODKA mark to Kai.[37] The sole receipt reflecting this importation shows the recipient as Mr. Marcus Bender of Kai Vodka, LLC, and indicates that the goods cost $6.[38] The receipt further indicates that the goods were "Sold To" Kai.[39]

Mr. Bender stated that he was "[b]asically trying to sell it by showing it [the sample bottles bearing the TAO VODKA mark] to various parties, but never actually made a sale."[40] Mr. Bender provided the samples, at no charge,[41] to three entities: an

---

[35] 44 TTABVUE 42 (Petitioner's Fifth Notice of Reliance).

[36] 45 TTABVUE 97 (Confidential Bender Discovery Deposition); 72 TTABVUE 67 (Bender Cross-Examination Deposition); 83 TTABVUE 11 (Confidential Exhibit N to Amended Bender Declaration).

[37] 80 TTABVUE 10 (Amended Bender Declaration).

[38] 72 TTABVUE 33-36 (Bender Cross-Examination Deposition).

[39] *Id.* at 57-59 (Mr. Bender reviewed the receipt and explained that it shows the "Consignee" as Kai, and indicates that the goods were sold to the consignee.

[40] 45 TTABVUE 75 (Confidential Bender Discovery Deposition).

[41] *Id.* at 51.

out-of-state shareholder of Kai named J.M. Stevens & Associates,[42] a restaurant across the street from Mr. Bender's office in Hawaii named Tango Contemporary Café, and a distributor named Northern Wine & Spirits, Inc., which received the samples in Mr. Bender's office in Hawaii. Mr. Bender testified that providing samples "to distributors and retailers is a customary, tried-and-true method of conducting business in the alcoholic beverage industry" to allow them to evaluate the product.[43] He stated that Respondent provided samples bearing the TAO VODKA mark to investor J.M. Stevens who, according to Mr. Bender, "agreed to offer the product to distributors, retailers, and other investors on Bender's behalf."[44] Mr. Bender testified that J.M. Stevens is "not a distributor so he can't sell vodka."[45] As to the samples shared with Northern Wine & Spirits, Inc. and Tango Café, "they did not purchase it. They only looked at it and reviewed it."[46] Mr. Bender also acknowledged that Respondent legally could not sell the goods directly to Tango Café.[47] None of these sales or distributions is supported by corroborating documentation. Rather, the evidence consists solely of, as Mr. Bender characterized it, "Just my word to you."[48] Mr. Bender testified as follows:

---

[42] 80 TTABVUE 12 (Amended Bender Declaration). We do not consider Mr. Bender's factual assertions regarding what J.M. Stevens may have done with the samples after receiving them, because they are either hearsay or speculation. *See* 45 TTABVUE 86-88.

[43] 80 TTABVUE 11 (Amended Bender Declaration), 83 TTABVUE 8 (Confidential Exhibit K).

[44] *Id.* at 12.

[45] 45 TTABVUE 87 (Confidential Bender Discovery Deposition).

[46] 72 TTABVUE 48 (Bender Cross-Examination Deposition).

[47] *Id.* at 50.

[48] *Id.* at 49-50.

Q. So just to summarize, J.M. Stevens & Associates, Northern Wine & Spirits, and Tango cafe have never purchased a single bottle of Tao Vodka; is that correct?
A. That's correct.
\*\*\*
Q. And is it correct to say that none of these entities have ever sold a single bottle of Tao Vodka?
MR. RAYNES: Same objection to form, relevance and foundation.
THE WITNESS: I believe it's true, uh-huh, that they have not.[49]

Prior to any sales under the mark, Respondent altered the font shown above, in response to a complaint from Petitioner.[50] According to Mr. Bender, Petitioner "specifically complained about the font used for the TAO VODKA mark. I disagreed with [Petitioner]'s complaints, but I immediately began to redesign the TAO VODKA label in May 2012."[51] According to Mr. Bender, five more cases of vodka labeled TAO VODKA were imported "on [Respondent's] behalf on or about August 23, 2012."[52] However, the record includes no information about any disposition of these goods in 2012. Mr. Bender alleges that Respondent limited the number of samples it distributed after receiving the cease-and-desist letter from Petitioner in April 2012.[53] As noted above, the first sales under the TAO VODKA mark took place in December 2014.[54]

---

[49] 45 TTABVUE 94 (Confidential Bender Discovery Deposition).

[50] 80 TTABVUE 15 (Amended Bender Declaration).

[51] *Id.* at 15.

[52] *Id.* at 13.

[53] *Id.* at 15.

[54] 45 TTABVUE 97 (Confidential Bender Discovery Deposition); 72 TTABVUE 67 (Bender cross-examination deposition); 83 TTABVUE 11 (Confidential Exhibit N to Amended Bender Declaration).

In May 2012, Respondent "proposed a business relationship" with Petitioner,[55] and Petitioner has provided written documentation of the proposal from December 2012.[56] Despite the lack of sales under the mark at that point, the proposal seeks *inter alia* a very substantial sum in the mid-six-figures from Petitioner for the sale of the TAO VODKA registration and "all common law right and goodwill associated therewith."[57]

## IV.    Nonuse as of the Statement of Use

"It is clear that an applicant cannot obtain a registration under Section 1 of the Trademark Act for goods or services upon which it has not used the mark. 15 U.S.C. § 1051." *Grand Canyon West Ranch, LLC v. Hualapai Tribe*, 78 USPQ2d 1696, 1698 (TTAB 2006). The Trademark Act provides that "[t]he term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127; *see also Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 120 USPQ2d 1640, 1642 (Fed. Cir. 2016) (providing an overview of the statutory use in commerce requirement); *Paramount Pictures Corp. v. White*, 31 USPQ2d 1768, 1773-75 (TTAB 1994) (reviewing the legislative history), *aff'd without published opinion, White v. Paramount Pictures Corp.*, 108 F.3d 1392 (Fed. Cir. 1997) (opinion available at 1997 WL 76957). The Trademark Act further specifies that a trademark shall be deemed to be in use in

---

[55] 80 TTABVUE 16 (Amended Bender Declaration).

[56] 68 TTABVUE 8-11 (Confidential Exhibit A to Wolf Rebuttal Declaration).

[57] *Id.* at 8.

commerce when the goods bearing the mark "are sold or transported in commerce." 15 U.S.C. § 1127. In this case, we consider whether the importation or distribution of samples described above meets the use in commerce requirement.[58]

The parties frame their nonuse arguments around the April 24, 2012 filing date of the statement of use ("SOU") underlying the challenged registration, as Respondent filed the SOU in advance of the September 20, 2012 SOU deadline. Petitioner emphasizes that the record includes no documentary evidence that Respondent used the mark as of the date of the SOU. Petitioner insists that the April 2012 invoice and corresponding shipping receipt from the Vietnamese distillery show Kai Vodka, LLC as the buyer and recipient, not Respondent. Petitioner also emphasizes that the back label of the bottle, the front label of which served as Respondent's specimen, identifies Kai Vodka, LLC as the brand owner.[59] Petitioner questions the reliability of Respondent's story, pointing out that while Mr. Bender testified that he received the shipment on or about April 12, 2012, the shipping receipt indicates that the Vietnamese distillery filled it out April 14, 2012.[60]

---

[58] Throughout the subsequent discussion of use and transportation in commerce, we cite and discuss some cases from prior to the revised definition of use in commerce that took effect in November 1988 as part of the Trademark Law Revision Act, requiring bona fide rather than token use. *See Paramount Pictures*, 31 USPQ2d at 1773-74. Because the new definition set a higher standard for the quantum and nature of use, prior case law under the old "token use" requirement is instructive because uses that did not qualify under the token use definition will not qualify under the newer, more stringent definition.

[59] *See* 81 TTABVUE 157-58 (Amended Bender Declaration Exhibit G).

[60] 83 TTABVUE 6 (Amended Bender Declaration Confidential Exhibit H); 72 TTABVUE 37-38 (Bender Cross-Examination Deposition).

Respondent concedes that it had not sold any goods under the mark as of the SOU filing date and did not sell goods until December 2014 at the earliest, when Respondent received a purchase order from a distributor.[61] However, according to Respondent, the distribution of vodka samples in late April 2012 (which we note was before the SOU deadline) suffices to establish the requisite use in commerce. In response to the references to Kai Vodka, LLC on the relevant documents, Mr. Bender testified that Kai Vodka, LLC used Tao Vodka Imports as a d/b/a, and imported the TAO VODKA samples "because of the contractual agreement between [the manufacturer] and Kai. [Respondent] had no contractual agreement with [the manufacturer]."[62]

Regardless of whether Respondent or Kai imported the samples, Respondent seems to concede in its brief[63] that it should not have relied on the April 9, 2012 shipment of vodka from the Vietnamese manufacturer as Respondent's date of first use in commerce in its underlying application. Drawing a distinction between importation and subsequent distribution, Respondent points to its provision of samples to third parties shortly after the vodka was imported as establishing that Respondent "made sufficient use of the TAO VODKA mark by [April 24, 2012]."[64]

---

[61] 45 TTABVUE 97 (Confidential Bender Discovery Deposition); 72 TTABVUE 67 (Bender Cross-Examination Deposition); 80 TTABVUE 16 (Amended Bender Declaration).

[62] 45 TTABVUE 67 (Confidential Bender Discovery Deposition).

[63] 93 TTABVUE 45 (Respondent's Brief).

[64] *Id.*

It is clear that on this record, the importation of vodka, whether by Respondent or by Kai acting on Respondent's behalf, does not establish the requisite use or transportation in commerce. In *Avakoff v. Southern Pacific Co.*, 765 F.2d 1097, 226 USPQ 435, 436 (Fed. Cir. 1985), our primary reviewing court held that a shipment of goods from the manufacturer to the trademark owner did not satisfy the use or transportation in commerce requirement, as "it was a shipment of the goods in preparation for offering the goods for sale. It did not make the goods available to the purchasing public." 226 USPQ at 436. Even when the shipment in *Avakoff* was considered in conjunction with contemporaneous advertising and subsequent sales of the goods, the activities failed to meet the standard because "mere advertising … does not constitute trademark use" and "subsequent sales of [goods] bearing the marks is not relevant in the absence of use in commerce prior to filing." *Id.* In *Clorox Co. v. Salazar*, 108 USPQ2d 1083, 1087 (TTAB 2013), the Board held that "transportation of goods from a manufacturer to the owner of the trademark, even when the goods bear the trademark, is purely a delivery of the goods to the trademark owner in preparation for offering the goods for sale and, therefore, does not constitute bona fide use of applicant's mark in commerce." Thus, neither the April nor the August 2012 shipment of vodka qualifies as use or transportation in commerce.

Turning to the *distribution* of samples, Petitioner analogizes it to mere advertising of the goods, and contends that such promotional activity does not qualify as use. According to Petitioner, the distribution of free samples does not equate to availability for sale, and does not constitute the requisite use. In addition, Petitioner

addresses in turn the particular recipients of the samples, emphasizing that the nature of each transaction undermines Respondent's claim of bona fide use in commerce. As to J.M. Stevens, Petitioner points out that it is a shareholder of Kai Vodka, LLC, the importer of the samples.[65] As to Northern Wine and Spirits, Petitioner asserts that this distribution occurred at Mr. Bender's office in Honolulu, thus not in interstate commerce, and the recipient never became a distributor of TAO VODKA.[66] As to Tango Café, because Respondent has stressed that an importer such as itself could not legally sell directly to a retailer such as Tango Café,[67] Petitioner argues that handing samples to it could not qualify as lawful use in commerce. Also, Petitioner again points out that this was an entirely intrastate activity.

Before addressing the legal issues raised by these arguments regarding distribution of samples, we pause to make observations regarding Mr. Bender's testimony. Mr. Bender testified that he distributed two to three complimentary sample bottles of vodka bearing the mark to each of the three entities referred to above, on Respondent's behalf.[68] Mr. Bender's cross-examination testimony regarding statements made in his declaration has undermined his credibility.[69] His cross-examination testimony reflects a lack of knowledge concerning key aspects of the declaration he provided as direct testimony, such as the assertions regarding third-

---

[65] 90 TTABVUE 36 (Petitioner's Brief); *see also* 80 TTABVUE 12 (Amended Bender Declaration).

[66] 90 TTABVUE 37 (Petitioner's Brief).

[67] 80 TTABVUE 10-11 (Amended Bender Declaration).

[68] *Id.* at 12-13.

[69] *E.g.,* 72 TTABVUE 76-79, 107-09 (Bender Cross-Examination Deposition).

party use of TAO marks, which he admits for the most part he did not "personally check."[70] As a result, we find the more self-serving aspects of his testimony less persuasive. *See Jim Dandy Co. v. Martha White Foods, Inc.,* 458 F.2d 1397, 173 USPQ 673, 676 (CCPA 1972) (rejecting proffered showing of use in commerce based on witness testimony that was "far from clear and definite"). In addition, we cannot ignore Respondent's lack of any records or other documentation corroborating Mr. Bender's testimony about the samples.[71] The presence of business records would strengthen the case that these transactions occurred in the ordinary course of trade, and the absence of such records does the opposite. *Cf. Research in Motion Ltd. v. NBOR Corp.,* 92 USPQ2d 1926 (TTAB 2009) (lack of documentation contributes to finding lack of bona fide intent to use a mark); *Commodore Electronics Ltd. v. CBM Kabushiki Kaisha,* 26 USPQ2d 1503, 1507 (TTAB 1993) (without countervailing facts, "the absence of any documentary evidence on the part of an applicant regarding such intent is sufficient to prove that the applicant lacks a bona fide intention to use its mark in commerce as required by Section 1(b)"). We now consider the legal issues, accepting for the sake of their consideration Respondent's reliance on its asserted distribution of samples.

Depending on the particular facts and industry practice, some types of promotional activities, such as distributing samples, may qualify as use in commerce. *See Automedx, Inc. v. Artivent Corp.*, 95 USPQ2d 1976, 1981 (TTAB 2010) (observing

---

[70] *Id.* at 78-79.

[71] *See id.* at 50-51 (Bender Cross-Examination Deposition, acknowledging only testimony, but no documents, offered to support assertions about the samples).

that "[u]se in commerce should be interpreted with flexibility to account for different industry practices."). While "test marketing has been recognized as sufficient to establish use of a mark," *id.*, such test marketing typically involves some limited actual sales rather than complimentary samples such as Respondent's.[72] *See, e.g., id.*; *E.I. du Pont de Nemours and Co. v. G.C. Murphy Co.,* 199 USPQ 807, 812 (TTAB 1987) ("[s]ales of goods under a brand name in a test marketing area are actual sales from which rights in a mark can accrue…. The use of a mark necessary to create a proprietary right therein must be an 'open and notorious' use reaching purchasers or prospective purchasers of the goods in connection with which the mark is used."). And even the sale of samples, in and of itself, does not necessarily meet the standard. In *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1 USPQ2d 1772, 1774 (Fed. Cir. 1987), our primary reviewing court held that sending a box of samples to obtain the opinion of an independent distributor did not qualify as use in commerce, even though the distributor sold the samples to customers, because the purpose of the shipment was "advisory consultation on the merits of a proposed trademark." *See also Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1046 (TTAB 1981) ("a shipment of an article or a prototype of an article for testing and experimentation is not a public use upon which trademark rights are created"). The determination thus is a fact-

---

[72] While actual sales are not required for statutory use in commerce, *see, e.g., McDonald's Corp. v. McKinley,* 13 USPQ2d 1895, 1898 n.6 (TTAB 1989), in the context of test marketing, whether the goods are sold can help inform whether the activity is in the ordinary course of trade.

based inquiry as to whether the activity in question is bona fide use in the ordinary course of trade.

Under the three-tiered system for alcohol sales (about which both parties agree), "a manufacturer or an importer (such as [Respondent]) can only sell its product to a distributor, who can only sell its products to a retailer, who in turn only sells it to the public."[73] Here, Respondent has acknowledged that J.M. Stevens is a shareholder of Kai and is not a distributor.[74] Respondent repeatedly attempts to rely on Kai's activities as being on behalf of Respondent to support bona fide intent to use and use in commerce, such as Kai importing samples and Kai obtaining formula and label approvals.[75] Sales under or uses of a mark which are "entirely between and within [a party's] organizations [do] not constitute a public use of the mark. Thus, such activities cannot be relied upon for any purpose herein." *See McQuay-Norris Mfg. Co. v. H-P Tool Mfg. Corp.*, 141 USPQ 405, 406 (TTAB 1964); *see also Sterling Drug Inc. v. Knoll A.G. Chemische Fabriken*, 159 USPQ 628, 631 (TTAB 1968) ("To acquire trademark rights there has to be an 'open' use, that is to say, a use has to be made to the relevant class of purchasers…. There was no such 'open' use rather the use can be said to be an 'internal' use, which cannot give rise to trademark rights."); *see also Blue Bell, Inc. v. Farah Mf. Co., Inc.*, 508 F.2d 1260, 185 USPQ 1, 4 (5th Cir. 1975) (sale of clothes to its sales managers was "insufficiently public to secure trademark

---

[73] 69 TTABVUE 4 (Bonbrest Rebuttal Declaration); *see also* 80 TTABVUE 10-11 (Amended Bender Declaration).

[74] 72 TTABVUE at 11 (Bender Cross-Examination Deposition).

[75] 80 TTABVUE 6, 12 (Amended Bender Declaration).

ownership," because "secret, undisclosed internal shipments are generally inadequate to support the denomination 'use.'"). Moreover, Mr. Bender acknowledged that J.M. Stevens is "not a distributor so he can't sell vodka."[76] As Mr. Bender described the activity at one point, "I sent bottles to Jim Stevens for him to share with industry people that he knows as well as potential investors."[77] The record includes no evidence from J.M. Stevens regarding the disposition of the samples. Taking into account all the evidence regarding sharing samples with J.M. Stevens, we find that the record reflects more of a preliminary outreach for general feedback or a potential investment in a possible project to sell TAO VODKA.

As for Tango Café, after explaining that Respondent is not a distributor, and could not directly sell vodka to a restaurant, a type of retailer in the three-tiered system, Mr. Bender described the activity in more detail:

Q. Did [Tango Café] contact a distributor to acquire Tao Vodka?

A. There was no distributor. This was a way to begin the process of finding out if we could actually solicit a distributor and create more product. This was actually a stepping stone into the first steps of being able to produce the product on a grander scale and be able to then resell it to distributors and importers.

Q. So as of April 24th, 2012, you did not have anyone agreeing to distribute Tao Vodka; is that correct?

A. That's correct.[78]

---

[76] 45 TTABVUE 87 (Confidential Bender Discovery Deposition). The statement referred to Jim Stevens, the owner of J.M. Stevens & Associates. *Id.* at 84.

[77] *Id.* at 85.

[78] *Id.* at 93-94.

This testimony reveals that this activity was preliminary and exploratory, and Respondent was not yet ready to introduce the product in the ordinary course of trade. Also, as noted in *Sterling Drug*, 159 USPQ at 631, "a use has to be made to the relevant class of purchasers or prospective purchasers." Having an acquaintance at a local establishment outside the relevant class of purchasers sample the vodka "to begin the process of finding out if [Respondent] could actually solicit a distributor" falls short of bona fide use in the ordinary course of trade.

As for Northern Wine & Spirits (the only one of the three that was actually a distributor to which Respondent could conceivably sell directly), Mr. Bender stated that "[t]hey were going to review it and see if they had interested parties in their market."[79] In responding in the negative to a question about whether Northern Wine & Spirits purchased the goods, Mr. Bender also stated, "They only looked at it and reviewed it."[80] There was no written follow-up from either side, and Northern Wine & Spirits never purchased or sold any of the product.[81] While Petitioner emphasizes that the transaction was entirely intrastate, within Hawaii, our reviewing court recently noted that the appropriate inquiry should focus on whether the general category of such transactions would cause a substantial effect on interstate commerce. *Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 120 USPQ2d 1640, 1644-45, 1647 (Fed. Cir. 2016) ("Because one need not direct goods

---

[79] *Id.* at 90.

[80] 72 TTABVUE 48 (Bender Cross-Examination Deposition).

[81] 45 TTABVUE 90 (Confidential Bender Discovery Deposition).

across state lines for Congress to regulate the activity under the Commerce Clause, there is likewise no such per se condition for satisfying the Lanham Act's 'use in commerce' requirement."). Therefore, we do not base our findings on the intrastate nature of the activity with Northern Wine & Spirits (and Tango Café).

We find that the record as a whole reflects that Respondent was not yet using or even ready to use the mark in the ordinary course of trade, but was merely exploring such use at some point in the future. In making this determination, we considered Mr. Bender's statements in his declaration regarding alcoholic beverage industry practices with regard to the distribution of samples and his assertion that "[t]he samples were provided so these companies could evaluate the product and determine whether they wished to buy large quantities of the product."[82] However, as noted above, we find his other characterizations of the activities more candid and informative. The record, particularly Mr. Bender's deposition testimony, shows that Respondent's activities were merely "'in *preparation* for offering the goods for sale. [They] did not make the goods available'" to Respondent's potential consumers. *See Avakoff*, 226 USPQ at 436 (quoting Board decision being affirmed). For example, in cross-examination testimony, Mr. Bender responded to a question confirming that none of the sample recipients purchased any of the goods by emphasizing, "Those -- those initial bottles changed to the final product. They were not ever sold, actually. They were used as a demonstration of what we were intending to do, and then we

---

[82] *Id.* at 120.

changed the design into what it is today."[83] *See Blue Bell*, 185 USPQ at 6 (bona fide use in trade requires that the mark "be affixed to the merchandise actually intended to bear the mark in commercial transactions"). Mr. Bender also testified that none of the three entities *ever* sold any TAO VODKA.[84] The absence of any sales whatsoever under the mark for more than 2½ years following Respondent's sample-related activities underscores their preliminary nature. While not essential to our finding, Mr. Bonbrest's testimony that disputes, in numerous respects, Mr. Bender's contention that his activity constitutes the norm for a product launch in the alcoholic beverage industry, lends additional support for our finding.[85] We find Mr. Bender's sharing of these samples with the three parties was more in the nature of a preliminary advisory consultation than bona fide use of the TAO VODKA mark in the ordinary course of trade. Thus, Respondent failed to make the requisite use of the mark in commerce prior to the Statement of Use deadline.

## V.  Likelihood of Confusion

Although our determination regarding nonuse suffices to grant the petition to cancel, given the broader nature of the parties' dispute, we also reach the issue of likely confusion.

The determination under Section 2(d) involves an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E.I. du Pont de Nemours*

---

[83] 72 TTABVUE 52 (Bender Cross-Examination Deposition).

[84] 45 TTABVUE 94 (Confidential Bender Discovery Deposition).

[85] 69 TTABVUE 5-7 (Bonbrest Rebuttal Declaration).

*& Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered, hereinafter referred to as "*du Pont* factors"); *see also In re Majestic Distilling Co.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the relatedness of the goods. *See In re Chatam Int'l Inc.*, 380 F.2d 1340, 71 USPQ2d 1944 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). We address these and other relevant *du Pont* factors below. Petitioner bears the burden of proving its claim of likelihood of confusion by a preponderance of the evidence. *Cunningham,* 55 USPQ2d at 1848.

A.    The Fame of Petitioner's Mark

Petitioner argues under the fifth *du Pont* factor that its TAO mark should be deemed famous. The strength of a mark rests on the extent to which "a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (citing *Palm Bay Imps. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)). This factor involves assessing the mark "'along a spectrum from very strong to very weak.'" *Id.* (internal citations omitted). A very strong mark receives a wider latitude of legal protection in the likelihood of confusion analysis. *See Palm Bay*

*Imps.*, 73 USPQ2d at 1694 (strong marks "enjoy wide latitude of legal protection" and are "more attractive as targets for would-be copyists"). Strength may be measured indirectly by the volume of sales and advertising expenditures in connection with the services sold under the mark, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the services identified by the marks; and the general reputation of the services. *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014); *see also Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1308 (Fed. Cir. 2002) (recognizing indirect evidence as appropriate proof of strength).

To demonstrate fame, Petitioner provided a variety of evidence, some of which is confidential and therefore will be discussed only in general terms. The TAO venues attract millions of customers a year and are among the highest-grossing restaurants and nightclubs in the United States.[86] The confidential record includes their revenue from January 2008 to September 2014, and the figure is quite impressive, a point made in the New York Times article a year earlier.[87] The TAO venues draw celebrity clients, generating mainstream media attention.[88] For example, media have publicized visits to the TAO venues by Tom Cruise, Robert DeNiro, Kim Kardashian, Sean "P. Diddy" Combs, LeBron James and many other professional athletes.[89] Also, the venues attract unsolicited media coverage, including articles in newspapers with

---

[86] 49 TTABVUE 8, 112-16 (Wolf Declaration).

[87] 50 TTABVUE 9 (Confidential Wolf Declaration).

[88] 49 TTABVUE 50-73 (Wolf Declaration Exhibit D).

[89] 49 TTABVUE 6 (Wolf Declaration).

wide circulation such as the New York Times and Los Angeles Times.[90] A 2007 New York Times headline for an article on the TAO venue in Las Vegas reads, "Setting Restaurant Records by Selling the Sizzle."[91] Petitioner also advertises the TAO venues extensively, and the confidential record establishes quite substantial marketing and promotional expenditures for a recent five year period.[92] As noted above, the TAO venues have received numerous forms of recognition in the industry.[93]

Petitioner's evidence of commercial strength in the form of customer volume and revenue statistics, advertising expenditures and examples, unsolicited media coverage, and awards and distinction within and outside the restaurant industry, reflects the renown of the mark and shows widespread consumer exposure to and recognition of Petitioner's mark. Overall, we find Petitioner's TAO mark to be famous, weighing in favor of a likelihood of confusion. However, even if we were to find the mark to be of average strength, our ultimate ruling on the likelihood of confusion claim on this record would remain the same.

B.    The Number and Nature of Similar Marks for Similar Services

Respondent argues under the sixth *du Pont* factor that Petitioner's mark is weak and diluted because it is highly suggestive of its Asian-themed services, and because

---

[90] *Id.* at 130-54.

[91] *Id.* at 134.

[92] 50 TTABVUE 7, 125-26 (Confidential Wolf Declaration).

[93] 49 TTABVUE 65, 69, 107 (Wolf Declaration) (R&I Restaurants & Institutions 2008 list), 105 (R&I Restaurants & Institutions 2009 list), 108 (R&I Restaurants & Institutions 2010 list), 110 (Huffington Post report on Restaurants & Institutions' list of Top 100 Independent Restaurants of 2010), 112-17 (www.restaurantbusinessonline.com), 146 (www.8newsnow.com), 122-125 (www.foodandwine.com).

of third-party "use and registration of 'TAO' in various industries."[94] However, Mr. Bender's cross-examination testimony made clear that he did not conduct the searches for the third-party webpages upon which Respondent relies on this point, nor did he verify their currency. Regarding "Table A" of his declaration that detailed third-party use of TAO marks:

> Q Did you run these reports yourself?
> A No, I didn't.
> Q Would someone else have told you that they were run?
> A I just told you that my attorneys did.
> Q Your attorneys told you this to be the case?
> A They did this work.[95]

We therefore disregard the information in his declaration that apparently constitutes hearsay and lacks underlying knowledge by Mr. Bender, but nonetheless consider the webpages attached as Exhibit W and Exhibit Y for what they show on their face, as they could have been admitted by a notice of reliance.[96] *FUJIFILM SonoSite, Inc. v. Sonoscape Co.*, 111 USPQ2d 1234, 1236 (TTAB 2014).

The Federal Circuit has held that evidence of the extensive registration and use of a term by others can be powerful evidence of the term's weakness. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015). In determining the strength or weakness of a mark, we consider both its inherent strength based on the nature of

---

[94] 93 TTABVUE 15 (Respondent's Brief).

[95] 72 TTABVUE 77-78 (Bender Cross Examination Deposition).

[96] 82 TTABVUE 3-100 and 175-99.

the term itself and its commercial strength based on use in the marketplace. *Cf. In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) (measuring both conceptual and marketplace strength). Use evidence may reflect commercial weakness, while third-party registration evidence that does not equate to proof of third-party use may bear on conceptual weakness if a term is commonly registered for similar goods or services. *See Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (CCPA 1976) (even if "there is no evidence of actual use" of third-party registrations, such registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used ").

Turning first to the third-party use evidence, the most probative consists of U.S.-based restaurant and alcoholic beverage webpages using Tao-formative names as presumptive indicators of source.[97] For example, the record includes webpages of:

- E-Tao restaurant in Houston[98]
- RJ Tao restaurant and lounge near Little Rock[99]
- Sushi Tao restaurant in Arcata, California[100]
- Tao restaurant in Salisbury, Maryland[101]
- Tao Asian restaurant in Pelham, Alabama[102]

---

[97] We have no basis upon which to conclude that webpages involving other types of goods and services, such as health food stores, 82 TTABVUE 25-28, nonalcoholic tea drinks, *id.* at 57-60, 63-67, and 88-90, dried herbal tea, *id.* at 61 and 68-72 or herbal chocolates, *id.* at 77-79, are sufficiently similar to bear on weakness of the term in this case. The evidence at 82 TTABVUE 175-98 suffers the same flaw. We also disregard foreign webpages. *See, e.g.,* 82 TTABVUE 13-14, 30-36, 76, 90.

[98] *Id.* at 3-4 (Exhibit W).

[99] *Id.* at 5-6.

[100] *Id.* at 7.

[101] *Id.* at 12.

[102] *Id.* at 15.

- Tao Asian in Winter Garden, Florida[103]
- Tao Garden in Winter Park, Florida[104]
- Tao Chen's restaurant in Chesteron, Indiana[105]
- Tao Garden restaurant in Chandler, Arizona[106]
- Tao Kitchen restaurant in Phoenix and Peoria, Arizona[107]
- Tao New Asian restaurant in Billings, Montana[108]
- Tao Tao restaurant in Sunnyvale, California[109]
- Tao Too restaurant in Germantown, Tennessee[110]
- Tao Vietnamese Japanese Cuisine in San Diego[111]
- Tao's Asian Cuisine restaurant in East Longmeadow, Massachusetts[112]
- Tao's Oriental Cuisine in Colorado Springs[113]
- The Tao of Tea Original Tao Teahouse in Portland, Oregon[114]
- a Yelp directory entry for Tao Sushi in San Francisco[115]
- a Yelp directory entry for Tao Yuen Pastry restaurant in Oakland, California[116]
- a Yelp directory entry for Tao San Jin restaurant in Antioch, California[117]
- the Facebook page of Tao Cha Café in Edmond, Oklahoma[118]

---

[103] *Id.* at 16, 22.

[104] *Id.* at 17.

[105] *Id.* at 18-19.

[106] *Id.* at 20-22.

[107] *Id.* at 23-24.

[108] *Id.* at 29.

[109] *Id.* at 39-40.

[110] *Id.* at 43.

[111] *Id.* at 44-46.

[112] *Id.* at 51-54.

[113] *Id.* at 55-57.

[114] *Id.* at 87.

[115] *Id.* at 92.

[116] *Id.* at 93.

[117] *Id.* at 94.

[118] *Id.* at 95.

- Mission Wine & Spirits, Jason's Wine & Spirits, Robert Burns Wines, the Liquor Collection, Continental Wine & Liquor websites all offering or promoting Raynal Tao Liqueur[119]
- Tao Vineyards promoting various Tao wines[120]
- Tao for beer on tap at Ocean City Brewing Company[121]
- a Beer Advocate review for Fen Tao beer from a Texas brewery[122]

Respondent did not show how long or how extensively these apparent third-party marks have been used. We have no sense of the degree of consumer exposure to these marks. Furthermore, the 2013 and 2014 dates on the faces of many of these webpages reflect that Respondent compiled this evidence almost two or in some cases more than three years before they were submitted in 2016, thereby lessening their probative value. Although Mr. Bender's declaration included a voucher of their currency, as noted above, his cross-examination testimony reflected no legitimate basis for this voucher[123] and we therefore do not credit it. Finally, Mr. Bender also admitted that Petitioner successfully challenged numerous restaurants using "Tao" in their names, including several apparently referenced in the third-party webpages.[124]

---

[119] *Id.* at 8-11, 80-82.

[120] *Id.* at 47-50.

[121] *Id.* at 82-86.

[122] *Id.* at 89.

[123] When asked about the dates of the third-party webpages in particular, as reflected in a table in his declaration, Mr. Bender stated "I – you know, I – I'm not sure, to be honest with you. You know, the dates there, I don't know what they actually – it looks like they tie together with when this was actually printed out." 72 TTABVUE 76 (Bender Cross-Examination Deposition). And later when asked if the years provided "refer to the years that your attorney told you that they saved this report," Mr. Bender replied, "You know, I'm really not sure." *Id.* at 77.

[124] 80 TTABVUE 32-34 (Amended Bender Declaration); 82 TTABVUE 198-285 (Amended Bender Declaration Exhibit Z).

The record also includes use-based third-party registrations of marks that consist of or include TAO. Most however, cover goods or services that we have no basis to find related to Petitioner's services, such as human resources consultation, clothing, digital media, cosmetics, soft drinks, tea and organizing tea ceremonies. Such registrations have no bearing on the strength of the term in the context relevant to this case. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for goods in other classes where the proffering party "has neither introduced evidence, nor provided adequate explanation to support a determination that the existence of I AM marks for goods in other classes, … support a finding that registrants' marks are weak with respect to the goods identified in their registrations"). Only one use-based registration, FEN TAO for beer,[125] covers more related goods, in that, like Respondent's goods, they are alcoholic beverages.

As to *commercial* weakness, "[t]he probative value of third-party trademarks depends entirely upon their usage." *Palm Bay Imps.*, 73 USPQ2d at 1693. Respondent's failure to establish the current nature and extent of use of the third-party marks, particularly given the previously discussed shortcomings of the evidence, serves to diminish its probative value. Also, Respondent's admission that Petitioner is assertive in enforcing its TAO mark, including against some of these establishments, undermines the persuasiveness of this evidence.[126] Taken as a whole,

---

[125] 82 TTABVUE 171 (Amended Bender Declaration).

[126] 93 TTABVUE 38 (Respondent's Brief); 80 TTABVUE 32-34 (Amended Bender Declaration); 82 TTABVUE 198-285 (Amended Bender Declaration Exhibit Z).

we cannot infer such a degree of recent consumer exposure as would show that consumers generally distinguish among marks containing "tao" based on minor distinctions.[127] *Cf. Primrose Retirement Communities, LLC v. Edward Rose Senior Living, LLC*, 122 USPQ2d 1030 (TTAB 2016) (weakness found based on at least 85 actual uses of ROSE-formative marks for similar services, eight similar third-party registrations, expert testimony and other evidence regarding the common nature of ROSE-formative marks in the industry, and testimony by opposer that it did not vigorously enforce its mark).

As to the conceptual strength of Petitioner's mark, Petitioner has acknowledged that "tao" in Chinese means "the way," but contends that "other than the goodwill achieved by Petitioner, the term 'TAO' has no definition or connotation concerning Tao's services."[128] The third-party evidence set out above shows numerous uses of "tao" in connection with restaurants featuring Asian food. Based on this evidence, which can be analogous to dictionary evidence that a term may have a recognized suggestive meaning, *Jack Wolfskin*, 116 USPQ2d at 1136, we find that in the context of restaurant services, "tao" suggests that the restaurant has an Asian theme or

---

[127] Because of the staleness of the evidence and the enforcement efforts by Petitioner, the record regarding third-party use evidence in this case differs from those in *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066 (TTAB 2011), which, as an additional distinction, involved proof of actual purchases of goods branded with the third-party marks, and *In re Broadway Chicken Inc.*, 38 USPQ2d 1559 (TTAB 1996), which, as an additional distinction, involved a much greater volume of third-party use evidence.

[128] 90 TTABVUE 14 (Petitioner's Brief). Petitioner's Registration No. 3770321 translates TAO as "the way." 49 TTABVUE 23. A definition in the record defines "tao" as "a Chinese concept signifying 'way,' 'path,' 'route,' or sometimes more loosely, 'doctrine' or 'principle.'" 81 TTABVUE 215 (Amended Bender Declaration, Exhibit U from Wikipedia.com).

serves Asian food. This suggestive meaning is consistent with Petitioner's use of TAO in connection with its Asian-themed restaurants and nightclubs.

Considering the record in its entirety, although "tao" has a suggestive meaning in the restaurant industry, given the compelling evidence that Petitioner's mark for its top-grossing restaurants and nightclubs is famous and widely known by consumers, the nature and quantity of third-party use and registration evidence does not convince us that Petitioner's mark is weak or entitled to only a limited scope of protection. The commercial strength of Petitioner's TAO mark outweighs any conceptual weakness.

C.    Similarity of the Marks

Turning to the first *du Pont* factor, involving the comparison of the marks, we consider them "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps.,* 73 USPQ2d at 1691 (quoting *du Pont*, 177 USPQ at 567). We remain mindful that "marks 'must be considered . . . in light of the fallibility of memory' and 'not on the basis of side-by-side comparison.' [citation omitted]." *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014). We also bear in mind our finding that Petitioner's mark is strong. *See Joseph Phelps Vineyards*, 122 USPQ2d at 1735 (this factor "warrants reasonable weight").

The only difference between the marks is the addition of the generic term VODKA to Respondent's mark. Although there is no mechanical test to select a dominant element, consumers would be more likely to perceive a distinctive term, even if suggestive, rather than a generic term such as VODKA, as the source-indicating

feature of the mark. *See, e.g., In re Dixie Rests., Inc.*, 41 USPQ2d at 1533-34 (affirming TTAB's finding that the dominant portion of the mark THE DELTA CAFE was DELTA, not the disclaimed generic term CAFE); *In re Binion*, 93 USPQ2d 1531, 1534 (TTAB 2009) (finding that the dominant portion of the mark BINION'S ROADHOUSE was BINION'S, not the disclaimed descriptive wording ROADHOUSE). "[I]n articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058, 224 USPQ 749, 750-51 (Fed. Cir. 1985); *see also Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014). Here, the dominant portion of Respondent's mark is identical to Petitioner's mark.

The shared term, TAO, results in a similar look, sound, meaning, and commercial impression. We do not find that VODKA changes the meaning of TAO in the context of the mark as a whole, or creates a basis on which consumers would distinguish source.

### D.    Relatedness of the Goods and Services

As to the goods and services, we must determine whether their degree of relatedness rises to such a level that consumers would mistakenly believe the parties' goods and services emanate from the same source. In making this analysis of the second *du Pont* factor, we look to the identifications of goods and services in the

pleaded and challenged registrations, as well as the goods for which Petitioner has established prior use (vodka). *See Stone Lion Capital Partners,* 110 USPQ2d at 1162; *Octocom Sys., Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Petitioner's services are: "Restaurant services" and "Night clubs, special events and party planning; and coordinating and providing facilities for entertainment events in the nature of parties and special events featuring music, singing, dancing, lectures, and celebrity or professional entertainment." Respondent's registration identifies "alcoholic beverages except beer." In this case, when comparing restaurant services to alcoholic beverages, we must also follow our reviewing court's holding that "the fact that restaurants serve food and beverages is not enough to render food and beverages related to restaurant services for purposes of determining the likelihood of confusion. Instead, . . . 'to establish likelihood of confusion a party must show something more than that similar or even identical marks are used for food products and for restaurant services.'" *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003) (citation omitted); *see also St. Helena Hospital,* 113 USPQ2d at 1087 (explaining the need to show "'something more' than the mere fact that the goods and services are 'used together'" in situations where the relatedness of the goods and services is obscure or not generally recognized).

The record shows the requisite "something more" to establish that the alcoholic beverages and restaurant and nightclub services are related in this case. First, Petitioner's evidence shows that it uses its TAO mark to promote alcoholic beverages,

which are the primary source of revenue in the TAO venues.[129] Petitioner's menus offer alcoholic drinks, including at least one vodka drink, that bear TAO-formative names, such as the "Tao-tini," "Tao-hito," "Tao-apolitan," "Tao Cherry Jubilee," and "Tao-love potion #9."[130] The TAO venues in New York and Las Vegas have offered the "Tao-tini" and "Tao-hito" since their opening in 2000.[131] Petitioner also engages in joint promotional events at the TAO venues with vodka manufacturers such as Stoli, Ciroc and Ketel One.[132] For example, promotional material for Khloe Kardashian's 30th birthday celebration at one of the TAO venues shows both the TAO and CIROC marks and highlights drinks containing vodka, including the "Tao-apolitan":

---

[129] 49 TTABVUE 9 (Wolf Declaration) ("sales of alcoholic beverages, spirits and cocktails are integral to the TAO brand, and account *for more than 50% of all revenue. Compare* Exhibit H (providing total revenue at the TAO Venues, *with,* Paragraph 23 [confidential], *supra* (providing total alcohol and vodka sales at the TAO Venues.)").

[130] *Id.* at 10, 77, 82.

[131] *Id.* While Respondent criticizes the lack of documentary evidence of actual use of these names, we find the testimony and corroborating documentary evidence in the form of promotional materials, menus, and a news article sufficient.

[132] *Id.* at 10 and 79-92 (Exhibit F).

[133]

Petitioner also advertises "Vodka Open Bars" at events at the TAO Venues.[134] Petitioner's evidence shows that consumers are exposed to its TAO mark used in the names of vodka drinks served at the TAO venues, in connection with "open vodka bars" advertised for the TAO Venues, and in co-sponsorship with vodka brands. Thus, Petitioner has affirmatively promoted an association between its nightclub mark and vodka.

Second, Petitioner has supplied evidence of the popularity, especially in the high-end restaurant and nightclub industry, of providing customers with "bottle service"

---

[133] *Id.* at 78.

[134] 47 TTABVUE 35-49 (Bonbrest Declaration Exhibit F).

that includes alcohol with private labels bearing the mark of the restaurant or nightclub.[135] Mr. Bonbrest's fact testimony, corroborated by exhibits attached to his declaration, indicates that "private-label bottling is prevalent in the restaurant and nightclub industries, and becoming more prevalent, especially amongst the well-known restaurants and nightclubs."[136] Mr. Bonbrest provided 18 examples of such private labelling of alcoholic beverages by restaurants (four of which are different locations of the same restaurant group) and clubs and, for most, he attached corroborating documents to his declaration.[137] Several of them appear along with TAO on the list of highest-grossing independent restaurants.[138] Mr. Wolf also provided testimony of a similar nature.[139] A 2012 New York Times article identified the Pink Elephant as a "high-end late-night club," stating, "Bottle service is the rule; they have their own Pink Elephant brand of vodka, from France."[140] A 2014 article from the Washington City Paper describes the growing trend among District of Columbia restaurants of offering "their own brands on the bar menu."[141] While, as

---

[135] *Id.* at 12-15, 104-06 (Mile High Spirits' webpage identifies it as a "full service private label distillery"); *id.* at 99-103 (Terressentia Spirits' webpage includes testimonials from "Private Label Customers," including restaurants and bars).

[136] *Id.* at 12. Respondent has expressed a preference for the term "own label" instead of "private label," 93 TTABVUE 29, but we do not find the distinction in terminology important for this discussion. We agree with Respondent that the persuasive value of private label evidence in this case would come from alcoholic beverages being sold by restaurants and nightclubs under the same mark used for their services.

[137] 47 TTABVUE 12-15 and 53-97 (Bonbrest Declaration).

[138] 49 TTABVUE 112-16 (Wolf Declaration) (e.g., Carmine's, Smith & Wollensky).

[139] *Id.* at 10-11.

[140] 47 TTABVUE 54-55.

[141] *Id.* at 108-11.

Respondent points out, when considered relative to the total number of restaurants and bars, the number of examples may be small, Mr. Bonbrest's testimony and the media articles to which consumers have been exposed suggest that consumers on a widespread basis must be aware of the practice, and particularly may have encountered private labelling in establishments like the TAO venues. Along with the other points previously discussed, this industry trend and the media attention it has received contribute to "something more" showing that consumers would be likely to perceive Respondent's goods as related to Petitioner's services. *Compare Coors Brewing Co.*, 68 USPQ2d at 1064 (court found "something more" lacking where the *only* basis was *de minimus* evidence of restaurants brewing or serving private label beer) *with In re Opus One Inc.*, 60 USPQ2d 1812, 1815-16 (TTAB 2001) (finding the requisite "something more" showing the relatedness of wine and restaurant services based on industry practice of private labeling as well as other considerations).

Third, Respondent's actions show that it believed that consumers would view Respondent's vodka and Petitioner's services as related. Specifically, the record shows that Respondent's sole owner rebranded an existing vodka product, Kai Vodka, as TAO VODKA, after an unsuccessful attempt to sell Kai Vodka to the TAO Venues. Respondent also initially displayed TAO on its vodka label using a stylized font very similar to Petitioner's.[142] Respondent next sought to sell its registration to Petitioner at a high price and enter into a lucrative business arrangement to sell large volumes

---

[142] 44 TTABVUE 42 (Petitioner's Fifth Notice of Reliance); 80 TTABVUE 15 (Amended Bender Declaration).

of TAO VODKA to Petitioner to serve in the TAO Venues.[143] Given this course of dealing and the very minimal evidence in the record of other contemporaneous efforts by Respondent to market TAO VODKA, we find that Respondent anticipated a benefit from implying a connection to Petitioner, a benefit that could only exist if Respondent believed that consumers would actually see Respondent's products as related to Petitioner's restaurant services. We therefore find that Respondent's actions contribute something more to the relatedness of the goods/services inquiry on the unique facts in this case, evidencing that consumers would believe that the goods and services come from the same source or sponsor. *Cf. Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374, 150 USPQ 80, 82 (5th Cir. 1966) (the actions of a businessperson "intimately concerned with the probable reaction of prospective purchasers in the market" manifests "highly persuasive" evidence on that point) (citation omitted); *Tisch Hotels v. Americana Inn, Inc.*, 350 F.2d 609, 146 USPQ 566, 570 (7th Cir. 1965) ("[W]e think that defendants adopted plaintiffs' name deliberately with a view to obtaining some advantage from plaintiffs' investments in promotion and advertising. The inference of likelihood of confusion is therefore readily drawn because the adoption itself indicates that defendants expected that likelihood to their profit.") (citations omitted); *see also Frehling Ent., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 52 USPQ2d 1447, 1453 (11th Cir. 1999) ("If it can be shown that a defendant adopted a plaintiff's marks with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to

---

[143] 68 TTABVUE 8-11 (Confidential Exhibit A to Wolf Rebuttal Declaration).

justify the inference that there is confusing similarity."); *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 25 USPQ2d 1913, 1924 (Fed. Cir. 1993) (applying Second Circuit law and stating, "[i]f there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded.").

This case is more like *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687 (Fed. Cir. 1993) than *Coors Brewing*, on which Respondent relies. The *Shell* court found the requisite showing based in part on evidence of an overlapping customer base and a greater degree of similarity of the marks. *Id.; see also Coors Brewing*, 68 USPQ2d at 1064 (distinguishing *Shell* on these bases). Here, the marks are also extremely similar, unlike the *Coors Brewing* marks that contained prominent differing design elements. Furthermore, Respondent's attempt to sell its vodka to Petitioner establishes that the parties' customer bases overlap, just as in *Shell*.

Based on this record, we find consumers are accustomed to encountering alcoholic beverages such as Respondent's together with restaurant and nightclub services such as Petitioner's, under the same mark. Respondent attempted to exploit this strategy with Petitioner. Also, Petitioner has used its TAO mark in connection with vodka drinks and vodka open bar services. Consumers therefore would likely infer that Respondent's goods, offered under the nearly identical mark, emanate from the same source as Petitioner's services, or are sponsored by Petitioner.

E.  Trade Channels

We presume that because Respondent's and Petitioner's identifications contain no trade channel restrictions, their goods and services travel through all usual channels of trade therefor. *See Viterra*, 101 USPQ2d at 1908; *see also Cunningham* 55 USPQ2d at 1846 (affirming Board finding that where the identification is unrestricted, "we must deem the goods to travel in all appropriate trade channels to all potential purchasers of such goods"). According to the testimony and other evidence, the usual trade channels for vodka include nightclubs and restaurants such as Petitioner's Tao venues. In fact, as discussed above, the TAO venues derive more than half of their revenue from alcohol sales.[144] Respondent's own activities attempting to sell its TAO VODKA in Petitioner's TAO venues leave no doubt as to the overlap in trade channels and classes of consumers.

Respondent argues that because its direct customers are distributors rather than individual consumers, the trade channels and consumers differ. However, Respondent acknowledges that its direct customers would in turn sell the same branded alcohol to retailers including restaurants, who would then sell it to consumers. This makes clear that alcohol subject to the three-tiered system ultimately can be sold under its brand name to individual consumers in restaurants and nightclubs such as Petitioner's. Thus, we do not find Respondent's argument persuasive.

---

[144] 49 TTABVUE 9 (Wolf Declaration).

The evidence amply demonstrates that, under the third *du Pont* factor, the goods and services identified in the respective registrations move in overlapping channels of trade to the same general classes of customers.

F.    Actual Confusion

Respondent argues that the lack of known instances of actual confusion weighs in its favor, particularly given Petitioner's claim that its mark is famous. Petitioner counters that Respondent's limited use minimized the opportunity for actual consumer confusion to occur. *See du Pont*, 177 USPQ at 567 (identifying seventh and eighth *du Pont* factors as "[t]he nature and extent of any actual confusion," and "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion"). We agree that Respondent's limited use[145] and sales created "little opportunity for confusion to have occurred." *See Barbara's Bakery Inc. v. Landesman,* 82 USPQ2d 1283, 1287 (TTAB 2007) (where the respective marks coexisted in the marketplace for at least nine years, absence of actual confusion nonetheless deemed "of little probative value" because of the absence of a significant opportunity for such confusion to occur, given "the minimal scope of applicant's actual use of her mark in the marketplace"). Accordingly, we find the seventh and eighth factors neutral.

---

[145] Respondent first sold to a distributor in December 2014, and the first recorded sale by that distributor to end consumers took place later in 2015. 72 TTABVUE 67-69 (Bender Cross Examination Deposition).

G. Purchasing Conditions

Respondent, asserting careful purchasing conditions, again relies on identifying its direct customers as distributors rather than end consumers of alcohol in an effort to argue careful purchasing conditions. Respondent also points to the $24-$27 retail sales price of its vodka as well as its unusual rice-based, gluten-free nature as supporting customer care in purchasing, even if end consumers are considered.[146] But Respondent's identification of goods is not limited as to price or ingredients. There is no basis to find that ordinary consumers purchasing alcoholic beverages within the normal range of prices would exercise more than an ordinary degree of care. Moreover, given the similarity of the parties' marks, as well as the overlap in their trade channels, we are not convinced that even careful purchasers would avoid confusion. *See Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 14 USPQ2d 1840, 1841-42 (Fed. Cir. 1990) (even sophisticated purchasers can be confused by very similar marks). This factor is neutral.

H. Bad Faith

Under the thirteenth *du Pont* factor, Petitioner maintains that Respondent acted in bad faith in adopting the TAO VODKA mark, and that this weighs in favor of likely confusion. *See, e.g., J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991) ("Whether there is evidence of intent to trade on the goodwill of another is a factor to be considered."); *Jewelers Vigilance*

---

[146] 93 TTABVUE 33.

*Committee, Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628, 1630 (Fed. Cir. 1988) ("proof of intent to trade on another's goodwill" can provide "persuasive evidence of likelihood of confusion") (citation omitted). We have discussed our consideration of some of Respondent's more eyebrow-raising activities in connection with other factors. *See Ava Enters., Inc. v. Audio Boss USA, Inc.,* 77 USPQ2d 1783, 1787 n.8 (TTAB 2006). In particular, such activities include: Respondent's selection and adoption of TAO VODKA for the same product as Kai Vodka after Petitioner declined to purchase Kai Vodka;[147] Respondent's adoption of a font very similar to that used by Petitioner for its marks;[148] and the nature of the "business proposal" Respondent made to Petitioner.[149] We find that this evidence further suggests confusion is likely.[150]

### Conclusion as to Likely Confusion

Considering all the relevant factors, we find confusion likely to arise from Respondent's use of a mark strikingly similar to Petitioner's commercially strong TAO mark for goods shown to be related to Petitioner's restaurant and nightclub services.

---

[147] 45 TTABVUE 26, 35 (Confidential Bender Discovery Deposition); 80 TTABVUE 8 (Amended Bender Declaration).

[148] 44 TTABVUE 42 (Petitioner's Fifth Notice of Reliance); 80 TTABVUE 15 (Amended Bender Declaration).

[149] 68 TTABVUE 8 (Confidential Wolf Rebuttal Testimony).

[150] Respondent accuses Petitioner of bad faith in the form of overly aggressive enforcement of its TAO mark. We find no bad faith on Petitioner's part.

**Decision**: Respondent's lack of use of its mark in commerce prior to the deadline for filing the statement of use, and the likely confusion between Petitioner's and Respondent's marks represent the bulk of the parties' dispute. Each ground provides an independent basis to cancel Respondent's registration. Accordingly, the petition for cancellation is granted and Registration No. 4169245 will be cancelled in due course. In the interest of judicial economy, we do not reach the remaining claims of lack of bona fide intent to use the mark or dilution.